Clive WILLIAMSON, Appellant,

v.

UNITED STATES, Appellee.

No. 90–883.

District of Columbia Court of Appeals.

Argued Oct. 17, 1991.

Decided April 21, 1992.

George Harper, for appellant.

Kristan Peters–Hamlin, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Elizabeth Trosman, and JiYoung Bang, Asst. U.S. Attys., were on the brief, for appellee.

1. D.C.Code § 22–3204(a) (Supp.1991).

2. D.C.Code § 6–2311 (1989).

James Klein, Jo–Ann Wallace, and David Bos filed a memorandum on behalf of amicus curiae, the Public Defender Service.

Before FERREN, SCHWELB and FARRELL, Associate Judges.

PER CURIAM:

The judgment of the Superior Court is affirmed. Under the circumstances of this case, the stop of appellant was permitted by the Fourth Amendment. The reasoning in support of this conclusion is contained in all but part II.B.1. of the opinion of Judge FARRELL and in part II of the concurring opinion of Judge SCHWELB.

FARRELL, Associate Judge concurring:

This appeal presents a search and seizure issue arising in the context of "a rapidly moving street occurrence ... involving a dangerous weapon," a situation this court has observed makes "[t]he need for immediate action" by police "more urgent" than in the case of less directly menacing offenses. *Rushing v. United States*, 381 A.2d 252, 256 (D.C.1978). *See also Cauthen v. United States*, 592 A.2d 1021, 1025 n. 8 (D.C.1991); *Adams v. United States*, 466 A.2d 439, 444 (D.C.1983); *Galloway v. United States*, 326 A.2d 803, 805 (D.C. 1974), *cert. denied*, 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975); *Cox v. United States*, 256 A.2d 917, 918 (D.C.1969). Because the conduct of the police in stopping appellant was reasonable under the Fourth Amendment, the ensuing seizure of a handgun in plain view was also valid and the motion to suppress was properly denied.

I.

Following his indictment for carrying a pistol without a license,[1] possession of an unregistered firearm,[2] and unlawful possession of ammunition,[3] appellant moved to suppress a gun and ammunition recovered from a car in which he was a passenger on the ground that he had been seized beforehand without articulable suspicion, in viola-

3. D.C.Code § 6–2361(3) (1989).

tion of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). At the suppression hearing the following testimony, credited by the trial judge, was given by the police officer involved.

On March 25, 1989, at 3:45 a.m., Officer Leland D. Schadt was on duty with a partner in an unmarked police cruiser, investigating a reported assault on the southwest corner of Georgia Avenue at Missouri Avenue, N.W., in the District of Columbia. Several shootings had occurred recently in the area, which was also known for its drug activity. While investigating the assault, Schadt heard several gun shots fired "across the street from the area of the southeast corner of Georgia and Missouri." He quickly walked to the corner and saw a car speed away on Missouri Avenue going east. He also saw appellant and two women "attempting to get into another car in what [Schadt] thought to be a very quick hurry." As Schadt approached this car, it began to back quickly out of a gas station parking lot. His gun still holstered, Schadt asked the driver to stop and directed the three occupants to raise their hands. He explained that he stopped the car because he was "[u]nsure whether these others were tied in with the car speeding off and, perhaps Mr. Williamson's is the group where the shot was at, trying to get out of the area[;] or whether the car speeding off had been shot at by this group." He "was unsure who had fired the shots and whether they [the occupants of this car] were involved or not." Asked on cross-examination why he focused on this particular car when there were "people running all over the place," Schadt replied that the occupants of the car "seemed to be trying to get away more than anyone else," because others were leaving by "running sort of backwards" from the scene.[4]

Because he was uncertain who had fired the shots, Schadt asked the occupants to raise their hands. The two women complied but appellant, the front-seat passenger, "raised only one hand and reached down with the other hand as if he was trying to hide something." "Unsure of what [appellant] was doing[,] and having heard the gun shots," Schadt drew his pistol and again ordered appellant to raise his hands.[5] Appellant continued to reach down, and raised his hands only after Schadt's third request to keep his hands in view. The officer ordered the occupants out of the car; when they had obeyed, he looked into the car and saw a pistol lying partially concealed under the floormat on the right front passenger side, near where appellant had lowered his hand.

In denying the motion to suppress, the trial judge credited Officer Schadt's testimony and made the following oral findings of fact and conclusions of law:

[Schadt] was diagonally across the corner investigating an assault that had taken place, very dangerous area, 3:00 in the morning, heard shots, from the diagonal corner, saw a car speed away, assuming that that car could have been the source of the shots, walked over to the area to investigate further.

Saw the car containing the defendant start to back up to pull away. At that point, he reasonably thought that that car could have been involved somehow in the shooting, *either as the victim or as the shooter, certainly as a possible witness* which, indeed, the people were.

He certainly had a basis to stop and question the people in the car, to stop the car. It was reasonable of him to ask the people to raise their hands, given his uncertainty, as to whether or not they had a weapon, given the fact that that shooting just took place when the defen-

---

**4.** Schadt acknowledged that in his radio broadcast made almost immediately following the shots he indicated that four shots had been fired from the car he had seen fleeing east on Missouri Avenue. He explained at the hearing: "I did not see the shots fired, sir. I just heard them. I apparently assumed [that] since that vehicle was speeding away, [it] had fired the shots."

**5.** Asked later whether, when he drew his gun, he had any "indication that any of the people in the car had committed a dangerous act," Schadt replied: "I had shots fired. I had a man reaching down as if he was trying to get something or hide something."

dant failed to obey his orders to raise both hands.

He saw the defendant reach down as if to hide something at that point. He ... certainly had grounds to pull his gun and to get the defendant out of the car for his own protection in order to neutralize the situation and to maintain his own safety.

In getting the defendant out of the car it was reasonable for him to look at the area where he reached and upon looking there saw the gun.

While I don't think there was probable cause of any sort of an offense being committed, ... there clearly was articulable suspicion and each of the acts the officer took was reasonably calculated to protect his safety and to further investigate what was clearly a serious criminal offense that had just taken place there.

The fact that the officer was alone on a dark corner in a dangerous area made his actions all the more reasonable under the circumstances.[6]

So I would find the actions he took to put him in a position to see the gun were reasonable under *Terry* to protect his safety and based on articulable suspicion. [Emphasis added.]

## II.

### A.

Appellant contends that when Officer Schadt "told the occupants to stop their vehicle and put their hands up, he effected a seizure under the Fourth Amendment," and that although Schadt then had "plenty of evidence that some crime had been committed, even if only the unlawful discharge of a firearm," he possessed no information "that indicated that Mr. Williamson had participated in the discharge of any firearm." According to appellant, at most the

officer had cause to believe appellant had witnessed the shooting, which was inadequate to justify his seizure under *Terry*. The government responds first that, under *California v. Hodari D.*, —— U.S. ——, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), appellant was not seized until he finally put his hands up as ordered, so that his actions in furtively reaching down to the floor, combined with the other facts known to Schadt, gave the officer unassailable founded suspicion to detain appellant and order him out of the car. The government argues, alternatively, that even without the furtive gesture, the officer's conduct in stopping the car to investigate and directing the occupants to keep their hands in view was reasonable in the circumstances and satisfied the requirements of *Terry*.

The government's first argument based upon *Hodari D.* is unpersuasive. Appellant was seized when the car he occupied was stopped by a show of authority as it began backing out of the parking lot. *E.g., Colorado v. Bannister*, 449 U.S. 1, 4 n. 3, 101 S.Ct. 42, 43 n. 3, 66 L.Ed.2d 1 (1980) ("There can be no question that the stopping of a vehicle and the detention of its occupants constitute a 'seizure' within the meaning of the Fourth Amendment"). As the trial judge concluded, Officer Schadt's direction to the car to stop, complied with by the driver and accompanied almost simultaneously by the officer's command to the occupants to raise their hands, was a seizure of the vehicle and its occupants.[7] Therefore, the reasonableness of Schadt's conduct must be evaluated without regard to the grounds for suspicion furnished by appellant's furtive movements after the seizure.

### B.

"The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jime-*

---

**6.** Although Officer Schadt had a partner with him at the time, the other officer apparently remained at the southwest corner of the intersection with the complainant in the assault case.

**7.** All three members of the division agree with this conclusion. *Richardson v. United States,* 520 A.2d 692 (D.C.1987), on which the government relies, is a different case. There we held

no seizure had occurred when the police yelled to a man walking along the street, "Police, wait a second. We want to talk to you." *Id.* at 696–97. In this case it is the combination of Schadt's direction to the car to stop and, in almost the same instant, his command to the occupants to raise their hands that constituted the seizure.

*no,* —— U.S. ——, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991). "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Id.* Derived from this underlying principle is the test for evaluating seizures of a person on less than probable cause, which "balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *United States v. Hensley,* 469 U.S. 221, 228, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985). One factor in the many informing this assessment is "whether the police are acting in a swiftly developing situation"; in such a case "the court should not indulge in unrealistic second-guessing." *United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). Especially is that so, as our cases cited at the beginning point out, where police confront "a rapidly moving street occurrence involving a dangerous weapon," rather than "a report of future criminal activity or of activity posing no threat to the public." *Adams v. United States,* 466 A.2d at 444. *See also Hensley,* 469 U.S. at 228, 105 S.Ct. at 680. In these circumstances, as the Supreme Court has explained:

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Adams v. Williams,* 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).[8]

Appellant argues that this "intermediate response" to "maintain the status quo momentarily while obtaining more information" was not justified in the present case because, according to appellant, Officer Schadt conceded that he had no reason to suspect that any *specific* individual, in the car or out, had committed a crime. *See, e.g., United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) ("An investigatory stop must be justified by some objective manifestation that the *person stopped* is, or is about to be, engaged in criminal activity") (emphasis added). To the contrary, Schadt's inability to identify the precise origin of the shooting did not make the stop unreasonable in the circumstances of this case.

### 1.

"The Fourth Amendment requires 'some minimal level of objective justification' for making the stop." *Immigration & Naturalization Serv. v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984). We have recognized that this "requirement of 'articulable suspicion' is not an onerous one," *Gomez v. United States,* 597 A.2d 884, 888 (D.C.1991), and does not require officers "to rule out the possibility of innocent behavior, for 'suspicious conduct by its very nature is ambiguous, and the principal function of the investigative stop is to quickly resolve that ambiguity.' " *Id.* at 890, quoting *State v. Anderson,* 155 Wis.2d 77, 84, 454 N.W.2d 763, 766 (1990). Here the police unmistakably had founded suspicion that a crime had been committed; what Schadt did not know was whether the crime was an unlawful discharge of a firearm or, worse, a shooting or attempted shooting of a person or persons. Schadt also did not know whether anyone had been

---

**8.** Before the Supreme Court spoke in *Adams,* indeed the year before *Terry v. Ohio* was decided, Judge Leventhal had anticipated the kind of problem posed by this case in writing:

> We are not dealing here with psychological gamesmanship staged in the backroom of the police station. As a society, we routinely expect police officers to risk their lives in appre-

hending dangerous people. We should not bicker if in bringing potentially dangerous situations under control they issue commands and take precautions which reasonable men are warranted in taking.

*Bailey v. United States,* 128 U.S.App.D.C. 354, 364, 389 F.2d 305, 315 (1967).

wounded. These are scarcely the sort of ambiguities that should have caused a responsible police officer to "shrug his shoulders" and forgo immediate investigation. Moreover, while the identity of the shooter(s) was ambiguous, it was not impermissibly so. Schadt heard shots from the direction of two cars, one of which immediately fled and the other of which quickly began to do so. The latter car contained two women and appellant. Either car could have contained the shooter in Schadt's view, but both were a more natural object of suspicion than other persons in the area who sought to leave in less hurried fashion.[9] Thus the direction from which the shots came and the fact that appellant and his companions were the only others leaving by car appeared to link them with the car fleeing down Missouri Avenue. This gave Schadt an objective reason to suspect appellant, as part of a distinct and small group of individuals, of taking part in a shooting seconds before. My colleagues disagree and view this knowledge as merely a "hunch," thereby eradicating the distinction between reasonable suspicion and probable cause on these facts. In the "swiftly developing situation" presented, *Sharpe, supra,* in which violence already might have produced bloodshed, Schadt's suspicion was not required to meet the level of individual-specific precision needed to support probable cause to arrest. *See* 3 W. LAFAVE, SEARCH AND SEIZURE § 9.3(d), at 461 (2d ed. 1987) ("Even if the circumstances are such that no one person can be singled out as the probable offender, the police must sometimes be allowed to take some action intermediate to that of arrest

and nonseizure activity"). *See also Wold v. State,* 430 N.W.2d 171, 174 (Minn.1988).[10]

Judge FERREN's dissent misapprehends the facts as presenting a situation in which Officer Schadt did not reasonably suspect appellant "of anything more than being in the vicinity when someone else fired a gun four times"; at best, according to Judge FERREN, appellant was one of a half dozen or more people "suspected of ... witnessing another's crime." *Post* at 485–86, 488. But Judge FERREN describes a different case: Here Schadt heard gunshots from the direction of two cars fleeing (or attempting to flee) the scene; and one of only two scenarios immediately suggesting themselves to him was that "the car speeding off had been shot at by this group [entering appellant's car]." Judge FERREN thus misreads the record in asserting that "the person or persons whom Officer Schadt suspected of firing the shots had fled the scene," *post* at 489, and other persons—including appellant—were simply removing themselves from harm's way. On the basis of what he heard and saw, Schadt suspected that *either* of two groups was the source of the shooting, but only one had not made its escape. And even if he had been certain the other car contained the shooter, he could not be certain that appellant's car—"tied in" with the other one—did not contain a victim. Far from being arbitrarily singled out for a stop, as Judge FERREN would have it, appellant and a narrowly defined group of others were the direct focus of the officer's reasonable belief that a violent crime had been committed.[11]

9. Unlike appellant and his companions who quickly jumped into a car, the other persons, according to Schadt, ran "sort of backwards" from the scene.

10. In *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), the Supreme Court reiterated that "[w]here the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Id.* at 91, 100 S.Ct. at 342. In *Ybarra,* the state sought to justify a patdown search of the defendant even though "the agents knew nothing in particular about [him] except that he was present, along with several other customers, in a public tavern at a

time when the police had reason to believe that the bartender would have heroin for sale." *Id.* The Court rejected this argument but had no occasion to consider the very different situation presented in a case such as this, where circumstances—*i.e.,* the discharge of a firearm—compel immediate police inquiry and the police attempt only to briefly detain the occupants of a car based upon articulated reason to suspect their involvement in the shooting.

11. Judge FERREN apparently would hold the tape of Schadt's radio decisive of what he perceived: since he had stated there that four shots were fired from the vehicle speeding away, his in-court testimony that *either* car could have been

In my view, to hold that Schadt's knowledge, measured by the perceptions of a conscientious police officer on the scene and not of a judge poring over the record in the library, failed the test of objective, articulable suspicion flunks the ultimate test of reasonableness under the Fourth Amendment.

### 2.

Even assuming that Officer Schadt lacked reasonable suspicion under *Terry* to believe appellant was a participant in the shooting, the Fourth Amendment did not bar the decision to stop him. In Schadt's mind, the occupants of appellant's car were *either* participants in the shooting *or* witnesses to it who could provide material information about the event and the possible identity of the shooter. Schadt was not required to sort out appellant's exact role—participant *or* witness—before stopping him to inquire about a just-completed crime of violence. No Supreme Court decision cited by Judge FERREN has addressed the issue whether police may detain a person in such circumstances long enough to clarify his involvement and ask about his knowledge. A substantial body of authority, however, supports the reasonableness of such a stop.

Professor LaFave observes that the Model Code of Pre–Arraignment Procedure "takes the sensible position that the power to stop may constitutionally be extended so as to encompass the brief detention of potential witnesses in at least certain situations." LaFave, § 9.2(b), at 353. The Code proposes that an officer be allowed to make a stop whenever

(i) the officer has reasonable cause to believe that a misdemeanor or felony, involving danger of forcible injury to persons or of appropriation of or danger to property, has just been committed near the place where he finds such person, and

(ii) the officer has reasonable cause to believe that such person has knowledge of material aid in the investigation of such crime, and

(iii) such action is reasonably necessary to obtain or verify the identification of such person, or to obtain an account of such crime.

MODEL CODE OF PRE–ARRAIGNMENT PROCEDURE § 110.2(1)(b) (1975). LaFave points out that "[t]his provision meets a genuine need, for it provides a lawful basis whereby 'an officer coming upon the scene of a recently committed crime [can] "freeze" the situation and obtain identifications and an account of the circumstances from the persons present.'" LaFave, § 9.2(b), at 354 (quoting commentary to § 110.-2(1)(b)).[12] At the same time, LaFave correctly observes that the provision "is much more narrowly circumscribed than the related provisions dealing with the stopping of suspects, which is as it should be." *Id.* Although the issue has not arisen frequently in reported decisions, several courts have agreed with the position of the Model Penal Code while stressing that "the police are justified in stopping witnesses only where exigent circumstances are present, such as where a crime has recently been reported." *Metzker v. State*, 797 P.2d 1219, 1221 (Alaska Ct.App.1990) (citing cases). *See Metcalf v. Long*, 615 F.Supp. 1108, 1115 (D.Del. 1985) ("[T]he initial stop of Metcalf [the

---

the source of the shooting was inaccurate (or untruthful) as a matter of law. But the trial judge was surely not required to hold the officer to the literalness of his radio statement—one intended to permit apprehension of a fleeing suspect—made seconds after shots were heard. Schadt explained the radio statement in court, note 4, *supra;* and even if *we* thought the radio run reflected what he actually perceived, we do not sit as factfinder. Judge Richter resolved any inconsistencies between the officer's statements by finding that Schadt believed an occupant of appellant's car could have been involved "either as the victim or *as the shooter,* certainly

as a possible witness" (emphasis added). This court simply cannot conclude as a matter of law that Schadt believed appellant was *only* a bystander or witness—in Judge FERREN's characterization of the record, someone "just passing through [a] high crime ... area[ ] at an unfortunate time when the police hear gunfire." *Post* at 490.

**12.** Judge FERREN's belief that there was no situation here to stabilize—"no 'status quo' to maintain," *post* at 489—simply illustrates how appellate judges can remove themselves from the reality of a case.

driver] was justified by the officers' reasonable suspicion that either the driver of the vehicle was Dennis Ponder [a fleeing felon] or that the driver had Ponder in his vehicle or knew of his whereabouts"); *Wold v. State, supra.*[13]

The reasoning which underlies § 110.-2(1)(b), and of the court decisions adopting it, provides a firm constitutional basis for the brief detention in this case where (a) the repeated discharge of a firearm involved the possibility of forcible injury to persons; (b) the officer had reason to believe that appellant—if not himself a participant—had knowledge material to the investigation; and (c) the detention of appellant and the other occupants was necessary to obtain their prompt account of the shooting.[14] Short of the stop of appellant's vehicle, there was no reasonable way in which the officer could obtain immediate information about the shooting which these occupants could reasonably be expected to provide.[15] Judge FERREN disagrees by suggesting that the police could have recorded appellant's license plate and consensually asked others on the scene (who were less quick in departing) for information. *Post* at 489 n. 8. But that is objectively unreasonable by requiring the police to risk loss of the freshest information about a just-committed violent crime; and it penalizes the officer for a split-second decision as to the means necessary to clarify an ambiguous situation involving danger to human life. Courts should encourage candor such as Officer Schadt displayed by admitting that he could not be certain whether appellant was involved in the shooting or instead a witness; the dissent would encourage just the opposite by instructing the officer that he may stop an individual briefly only when he can later profess to pinpoint him in the former role.

We have no occasion to decide here whether a potential eyewitness may be stopped when other, less violent forms of crime are involved or circumstances are less demanding of immediate police action than those presented here. Nor need we explore the proper scope of the detention of such a witness as regards either its length or the intensity of the intrusion.[16] In this

---

13. In *United States v. Ward,* 488 F.2d 162 (9th Cir.1973) (en banc), in ordering suppression of evidence seized as the result of a stop, the court pointed out that "most significantly, the stop was not made pursuant to the agent's founded suspicion that the *detainee* was involved or about to be involved in criminal activity," but rather "was made for the purpose of questioning the appellant about a *third person,*" *id.* at 169 (emphasis in original). In *Ward,* however, "there was no crime 'afoot.' The FBI agents did not stop appellant's car in connection with any particular crime, but rather the stop was pursuant to a general criminal investigation that had begun several months before. There was no emergency situation nor any need for immediate action." *Id.* As LaFave states, "*Ward* is quite different from the situations encompassed within the Model Code provision, as to which courts have reached a contrary result." LAFAVE, § 9.2(b), at 355.

14. *Amicus curiae,* the Public Defender Service, points out that in 1969 Congress declined to enact proposed legislation that would have authorized police in the District of Columbia to detain witnesses for up to twenty minutes for purposes of investigation. *See* H.R. 14335, 91st Cong., 1st Sess. (1969). No more can be inferred from this legislative inaction than that Congress decided to let the law develop judicially in this area in accordance with the Fourth Amendment.

15. Judge FERREN confuses the issue by asserting there was no "reasonable cause" to believe appellant had *knowledge* about a shooting that occurred only yards from him seconds earlier because the officer did not know appellant "was *doing* anything but trying to get away from [the] area...." *Post* at 486 n. 5 (emphasis added). In the dissent's view, apparently, logic requires a person's involvement in a shooting before he can reasonably be thought to have information about the shooter or the circumstances.

16. Judge FERREN is thus in error when he states that "[t]he majority refuses to consider the additional invasion of privacy many 'suspected witnesses' are likely to suffer after seizure," including frisks of their person and searches for weapons. *Post* at 488. We expressly do not consider whether a witness detained under the circumstances we describe could be searched. Judge FERREN is convinced such searches are inevitable only because he believes that police, apparently aided by activist courts, will "push more and more beyond traditional constitutional protections." *Id.* We reiterate our agreement with the drafters of the Model Code provision that any authority to detain witnesses must be "much more narrowly circumscribed" than the authority to stop suspects.

case, before Officer Schadt could ever question him, appellant engaged in movements causing legitimate concern by the officer for his safety, in turn justifying his decision to draw his weapon and direct the occupants to leave the car. *See In re T.T.C.*, 583 A.2d 986, 988 n. 2 (D.C.1990) ("supervening behavior, such as a furtive movement during the course of an investigatory stop, may reasonably lead an officer to fear for his safety and justify an escalation in the level of force used"); *Marbury v. United States*, 540 A.2d 114, 116 (D.C. 1985). From a place where he was entitled to be, Schadt then saw the gun only partly concealed on the floor of the car below the seat appellant had occupied.

Unlike the dissent, we do not believe the Fourth Amendment and its general command of reasonableness require courts to reduce a police officer to an essentially passive recorder of events at the scene of a shooting involving danger to human life. Under the circumstances here, the stop of the car and its occupants was permitted by the Constitution, and the gun was properly admitted into evidence.

SCHWELB, Associate Judge, concurring:

Judge FERREN and I—a majority of the division—do not believe that the information available to Officer Schadt was sufficient to support an articulable suspicion that Williamson personally had committed a crime or was about to do so. Essentially for the reasons stated by Judge FARRELL in Part II.B.2 at pages 476–78 of his opinion, however, I agree that the seizure was reasonable in spite of the lack of specific information regarding wrongdoing on the part of Williamson.

1. Daydria Ellis, the owner of the Ford, and one of Williamson's companions on the evening in question, also testified. Ms. Ellis denied that she and her friends tried to leave in a hurry, insisting that they stayed around and waited for the approaching officer because she was "nosey" and wanted to know what was happening. According to Ms. Ellis, the car was stationary when Officer Schadt approached, and the officer drew his pistol before saying anything. Ms. Ellis stated that the officer repeatedly told her to shut up when she inquired what was happening. The judge, while specifically crediting Offi-

I

I have no quarrel with Judge FARRELL'S description of the evidence so far as it goes, but I think it may in some measure advance the plot to mention a little more. On cross-examination, after describing his approach to the 1983 Ford automobile occupied by Williamson and his two women friends,[1] Officer Schadt testified that he asked everyone "to please raise their hands so I can see them." The following colloquy ensued:

Q. At this point, you had no indication that any of these people had committed a crime, is that correct?

A. That's more or less correct.

Q. But you asked them to raise their hands?

A. Yes, I did.

Q. And at some point after that then you pulled your weapon?

A. Yes, I did.

Q. And at that point you had no indication that anybody in the car had committed a crime?

A. At that point I was more concerned with my safety than worrying about what they had done.[2]

Essentially, Officer Schadt acknowledged that he had no basis for suspecting Williamson of a crime, and he indicated that the detainees' criminality or lack thereof was not then a significant concern.

Moreover, the tape recording of Officer Schadt's request over the police radio for assistance, which he made prior to approaching the Ford, and which was played at the suppression hearing, revealed that the officer had advised the dispatcher that "four shots were fired from a vehicle and [it] looks like it's speeding east on Missouri

cer Schadt, also found that it "may well be" that both the officer and Ms. Ellis were "telling the truth as they remember it."

2. As we recently noted in *Gomez v. United States*, 597 A.2d 884, 891 (D.C.1991), "if the officer lacked articulable suspicion to seize [Williamson], the seizure could not be justified upon the notion that it would be dangerous to chat with [Williamson] and his companions without restricting their liberty."

Avenue." Officer Schadt testified at the hearing that he had apparently assumed that, since this first vehicle was speeding away, it was the source of the shooting.

To be sure, the officer also explained that Williamson and his companions "seemed to be trying to get away more than anyone else." Surely, though, this is a slim reed indeed on which to predicate a finding of articulable suspicion. Anyone eager to survive long enough to enjoy further opportunities to smell the roses could reasonably view the need to depart from that scene as being "pregnant with an urgency" that brooks no unnecessary delay. *Harris v. District of Columbia Comm'n on Human Rights*, 562 A.2d 625, 626 (D.C. 1989). I know I would.

I must therefore part company with Judge FARRELL when he insists that Officer Schadt "had an objective reason to suspect appellant, as part of a distinct and small group of individuals, of taking part in a shooting seconds before." All that is required for a *Terry* [3] stop is "some minimal level of objective justification" for making it. *Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984). Minimal, yes, but not *that* minimal! The record in this case compels the conclusion that Williamson was not really seized because he was a suspect. As the trial judge sensibly found, the officer

> reasonably thought that that car could have been involved somehow in the shooting, *either as the victim or as the shooter, certainly as a possible witness* which, indeed, the people were.

(Emphasis added.) The officer's testimony demonstrates that Officer Schadt had no time to determine which of these three categories—perpetrator, victim, or indepen-

dent witness—applied to Williamson and his friends. Plainly, as the officer effectively acknowledged, he made no attempt to do so.

Our voyage would perhaps be smoother if we could comfortably fit this case within more conventional *Terry* principles and avoid sailing the comparatively uncharted (in this jurisdiction) waters described in part II.B.2 of Judge FARRELL's opinion. In my opinion, however, this would require us to fit square pegs into round holes and to ignore dispositive testimony on the part of the arresting officer, as well as the key finding by the trial judge.

## II

I fully agree, however, for the reasons stated by Judge FARRELL, that the seizure did not run afoul of the Fourth Amendment if, as the evidence here indicates, the officer reasonably believed that Williamson and his companions could have been victims, witnesses, or suspects, even though he could not yet tell into which of these categories they belonged. As the Supreme Court of Minnesota explained in *Wold v. State*, 430 N.W.2d 171, 174–75 (Minn.1988),

> [o]ur court, as well as courts of other states, have recognized that in order to "freeze" the situation, the stop of a person present at the scene of a recently committed crime of violence may be permissible without trampling on the Fourth Amendment prohibition against unreasonable search and seizure.... Especially is such a stop deemed permissible where only a limited number of persons are present at the scene of a violent crime.

(Citations and footnote omitted).

*Wold*, as the foregoing passage reveals, is in point; [4] the authorities cited by Judge

---

3. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

4. Any objective reader of the Minnesota Supreme Court's decision in *Wold* will conclude, in my view, that the quoted passage is a part of the court's holding, and not dictum as Judge FERREN suggests.

   Moreover, Judge FERREN quotes 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE

FOURTH AMENDMENT § 9.3(d), at 461 (2d ed. 1987) in the second half of footnote 4 to his dissenting opinion, for the proposition that Williamson could be seized only if the police reasonably suspected him or one of his companions of criminal activity. This passage comes 107 pages after Professor LaFave's discussion of the MODEL CODE OF PRE-ARRAIGNMENT PROCEDURE, *id.* § 9.2(b) at 353–54, and of the scope of an officer's authority to stop an individual at a crime scene without

FERREN are not. He quotes *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), as well as several other cases, for the proposition that an "investigatory stop must be justified by some objective manifestation that *the person stopped* is, or is about to be, *engaged in criminal activity.*" (Emphasis added.) He apparently takes the view that the italicized language resolves the issue on which he and the other members of the division part company, and that the police are therefore precluded from stopping an individual, even immediately after the apparent commission of a serious crime, without first sorting out (within the fleeting moment that it would take that individual to depart) whether he or she is a suspected wrongdoer rather than a possible victim or third party witness.[5] In my opinion, Judge FERREN'S position "is predicated on a misconception of the nature and uses of judicial precedent, and therefore makes far too much out of too little." *Khiem v. United States,* No. 91–1028, slip op. at 7–8 (D.C. Mar. 20, 1992).

As Judge FARRELL points out in the lead opinion, none of the cases cited by Judge FERREN presented the question which Judge FERREN now claims that they settled, nor did the courts have occasion to consider the contention which he says these decisions foreclosed. Both in *Khiem, supra,* slip op. at 8, and previously in *United States v. Alston,* 580 A.2d 587, 594 n. 12 (D.C.1990), this court has noted and quoted the Supreme Court's meaningful caution in *Armour & Co. v. Wantock,* 323 U.S. 126, 132–33, 65 S.Ct. 165, 168, 89 L.Ed. 118 (1944):

It is timely again to remind counsel that words of our opinions are to be read in the light of the facts of the case under discussion. *To keep opinions within reasonable bounds precludes writing into them every limitation or variation which might be suggested by the circumstances of cases not before the Court.* General expressions transposed to other facts are often misleading.

(Emphasis added.) Moreover, as we first stated in *Kraft v. Kraft,* 155 A.2d 910, 913 (D.C.1959), and more recently reiterated first in *Alston,* 580 A.2d at 594 n. 12 and then in *Khiem,* slip op. at 8.

[i]t is well to remember that significance is given to broad and general statements of the law only by comparing the facts from which they arise with those facts to which they supposedly apply.

Judge FERREN has not heeded these warnings. He does not suggest, nor can he, that *Cortez* (or any other opinion cited by him) involved a scenario similar to the present one or presented the question with respect to which he disagrees with Judge FARRELL and me. That very issue was, however, decided in the prosecution's favor in *Wold* and in the decisions cited by Judge FARRELL.

It is surely uncontestable that a point which was not raised in the cases on which Judge FERREN relies could not have been decided in those cases. Moreover, since the issue which now divides the panel was not presented to the court in *Cortez* or in the other cases cited by Judge FERREN, the United States never had the opportunity to

---

being sure whether that individual is a witness or a suspect. On the basis of his juxtaposition of two unrelated passages located in different parts of the same treatise, Judge FERREN maintains that "it is clear" that Professor LaFave would authorize seizure of possible witnesses or suspects "only if there is a reasonable, objective basis for believing that at least one of the persons seized has committed a crime." Such clarity is in the eye of the beholder; one person's luminosity is another's opaqueness. In fact, Professor LaFave subscribes to the "sensible position," *id.* § 9.2(b), at 353, taken by the MODEL CODE, which contains no limitation of the kind Judge FERREN seeks to attribute to (or foist upon) this distinguished Fourth Amendment scholar.

**5.** There is an obvious difference between my position as articulated above and the views attributed to me in the fourth paragraph of the dissent, in which Judge FERREN claims to discern inconsistency between Judge FARRELL'S approach and my own regarding the issue at hand. There is no such inconsistency. To eliminate any doubt as to my assessment of the record, this is not a case where the officer knew that Williamson was not a suspect but had an articulable suspicion that he might be a witness or victim. Rather, the officer had a reasonable basis for suspecting that Williamson fell into one of those three categories, although he could not yet determine which.

present its law enforcement interest for the court's consideration, and Judge FERREN's thesis was not tested by "the fires of adversary presentation." *Allen v. United States*, 603 A.2d 1219, 1229 n. 20 (D.C.1992) (quoting *United States v. Crawley*, 837 F.2d 291, 293 (7th Cir.1988)). Under all of these circumstances, the authorities on which Judge FERREN relies "may not be converted, by barristerial ingenuity or judicial alchemy, into a sweeping rejection of contentions which were neither before the court nor relevant to the issues then at hand." *Khiem, supra,* slip op. at 9.

The Constitution does not bar all seizures. It prohibits only unreasonable ones. The Fourth Amendment was not designed to consign to virtual impotence a police officer who is attempting to investigate an apparent armed offense moments after it occurred, and who needs information to help him to apprehend the perpetrator and thus to reduce the risk of injury to persons or property. It makes no sense to me to suggest that in the situation which confronted Officer Schadt immediately after the shooting, he could lawfully do nothing but twiddle his thumbs [6] and perhaps write down the license number of the car in which Williamson and his friends were seated. Our adoption of such a notion would be so removed from the reality of the street and from the right and obligation of the police to investigate violent crime as to invite understandable public ridicule of the judiciary. Accordingly, I vote to affirm the judgment.

FERREN, Associate Judge, concurring in part, dissenting in part, and dissenting from the judgment:

Today my two colleagues effectively announce that the possibility someone is

merely a witness to a crime provides an appropriate basis, consistent with the Fourth Amendment, for seizing that person for questioning. No court has ever held this.[1] With all respect due, I believe that the majority's analysis and result are unprincipled and unfounded—permitting a gross violation of constitutional rights—and that this court, sitting en banc, should swiftly vote to vacate.

I.

I join in Part II.A. of Judge FARRELL's opinion, for I agree that the analysis in *California v. Hodari, D.,* —— U.S. ——, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), is irrelevant; appellant was seized the moment Officer Schadt stopped the car and asked appellant and his companions to put their hands in the air. But I reject Part II.B.1. of Judge FARRELL's opinion justifying appellant's seizure as a suspect of criminal activity. Instead, I join Part I of Judge SCHWELB's opinion to the contrary, announcing the majority view on that issue: Officer Schadt failed to point to specific and articulable facts justifying reasonable suspicion that appellant had been engaged in criminal activity within the meaning of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). That should end this case, requiring a reversal and remand for erroneous denial of the suppression motion.

But my colleagues collaborate on a new and dangerous—and unconstitutional—rule of law to justify affirmance. I emphatically reject their approval of appellant's seizure as a ·possible witness, "victim," [2] or suspect, without reasonable, articulable

---

**6.** Judge FERREN would approve the "consensual interviewing of bystanders." Dissenting op., note 2. Although the judge reasonably viewed Officer Schadt's direction to the occupants of the car to stop and to let him see their hands as a Fourth Amendment "stop," the line between a seizure and a consensual encounter can be somewhat fuzzy. Here, for example, if Officer Schadt wished to interview Williamson and his friends on a consensual basis, he would have had to signal to the driver to stop. Moreover, at that place, at that time, and under those circumstances, the officer's insistence that the occu-

pants keep their hands in view was surely prudent rather than irrational.

**1.** That probably is the reason why the government neither briefed nor argued this proposition until this court asked for post-argument submissions.

**2.** There is no indication whatsoever in the record that anyone had been injured. Thus, the reference to "victim," on the facts of this case, can only mean a possible complainant: an eyewitness at whom the shooter aimed and missed.

suspicion that appellant had engaged in a criminal act.

Because my colleagues have failed to write one opinion, it is difficult to interpret the principle they announce. There appear to be clear differences between their approaches, and yet they purport to reconcile those differences without clear explanation. Judge FARRELL, believing that Officer Schadt had a reasonable basis for seizing appellant under *Terry,* votes to affirm by relying primarily on *Wold v. State,* 430 N.W.2d 171 (Minn.1988). In *Wold,* the Minnesota Supreme Court considered, under *Terry,* a police patdown of a man who, along with another man, was standing next to the comatose body of a stabbing victim, harassing the paramedics who were trying to give help. As I understand that opinion, the court held the seizure was justified under *Terry* by reasonable suspicion that appellant may have been engaged in discernible criminal activity, even though it might have turned out that appellant had only "witnessed the crime." *Id.* at 175.[3] *Wold* cannot be read to hold that someone may be lawfully seized during the investigation of a recently committed crime on less than reasonable, articulable suspicion of involvement in criminal activity.

In contrast, Judge SCHWELB, concluding that Officer Schadt did not have reasonable suspicion that appellant had been engaged in criminal activity, focuses on dicta in *Wold* attributable to Professor LaFave. My colleague incorrectly relies on that dicta to justify "freezing" the "scene of a violent crime," *ante* at 479, without having articulable facts showing that someone on the scene participated in criminal activity.[4] Putting aside the fact that, in this case, the most likely suspects had fled the scene before Officer Schadt approached appellant and his companions, and ignoring as well the fact that there was no sign of a violent crime when Officer Schadt approached the car, Judge SCHWELB justifies appellant's seizure, without *Terry* suspicion, on the speculative and elastic ground that he may have been a witness, a complainant, *see supra* note 2, or a suspect. But unlike Professor LaFave, *see supra* note 4, Judge SCHWELB does not require reasonable suspi-

---

3. *See* W. RINGELL, 2 SEARCHES & SEIZURES, ARRESTS AND CONFESSIONS, § 13.4(d)(2) at 13–46.1—13.47 (1991) (chapter on *Terry* stop and frisk) (discussion of *Wold* in section on suspect's nearness to scene of crime as factor which, when combined with other factors, may justify *Terry* stop); *see also In re J.G.J.,* 388 A.2d 472, 474 (D.C.1978) (per curiam) (noting proximity to scene of crime as one factor justifying *Terry* stop).

4. In his treatise, Professor LaFave declares:

> [T]he power to stop may constitutionally be extended so as to encompass the brief detention of potential witnesses in at least certain situations.... [where] "an officer coming upon the scene of a recently committed crime [can] 'freeze' the situation and obtain identifications and an account of the circumstances from the persons present."

W. LaFAVE, 3 SEARCH & SEIZURE § 9.2(b) at 353–54 (quoting MODEL CODE OF PRE-ARRAIGNMENT PROCE-

DURE § 110.2(1)(b)). A reading of all relevant sections of LaFave's treatise gives some definition to the "certain situations" in which he believes the police may "freeze the scene":

> In a situation such as [a recently committed robbery], ... the police must have some authority to *freeze the situation.* Even if the circumstances are such that *no one person can be singled out* as the probable offender, the police must sometimes be allowed to take some action intermediate to that of arrest and nonseizure scrutiny. This is not to suggest a "dragnet approach," resulting in the temporary seizure of a large number of persons within the range of possible flight of the robber, is either permissible or desirable. What are needed and appropriate in this context are *"selective investigative procedures" whereby seizures are made only of those as to whom there exists a "reasonable possibility" of their being the robber.*

*Id.* § 9.3(d), at 461 (footnotes omitted) (emphasis added), *cited with approval in Wold,* 430 N.W.2d at 174–75 n. 3, *ante* at 475 (Farrell, J., concurring). It is therefore clear that Professor LaFave himself justifies freezing the scene, permitting seizure of possible witnesses or suspects, only if there is a reasonable, objective basis— call it a *Terry* basis—for believing that at least one of the persons seized has committed a crime.

---

Rather than adopt—as the majority does—the trial court's unsubstantiated conclusion that Officer Schadt could have reasonably believed appellant or one of his companions had been a "victim" of a crime, I will refer to appellant in the remainder of this opinion as a "possible witness," either eyewitness or complaining witness, except when I quote from one of my colleague's opinions.

cion that at least one of the persons stopped may have committed the crime.

In short, the principal authority on which each of my colleagues relies—*Wold* for Judge FARRELL and LaFave for Judge SCHWELB—does not support his particular approach.

Because Judge FARRELL votes to affirm despite two votes against his *Terry* justification for the seizure, he necessarily joins Judge SCHWELB's analysis, which effectively says: If a police officer has no objective articulable basis for believing any particular person found near the scene of a crime may have engaged in criminal activity, but has a subjective hunch that a particular person may have done so, the officer may lawfully seize that person simply by coupling this subjective belief with a reason to believe that the less-than-suspicious person may at least have witnessed the crime.

We are therefore left with a dismaying and unprincipled result. Judge SCHWELB and I see no objective basis for an investigative seizure based on suspected criminal activity, and yet Judge SCHWELB and Judge FARRELL sustain the investigative seizure of appellant, not because there was a reasonable, articulable basis under *Terry*, but because there was a possibility that he fit one of three categories: eyewitness, complainant, suspect. This means, I gather, that when there is merely a subjective, call it intuitive, basis—not a reasonable basis under *Terry*—for believing someone committed a crime, a seizure will be justified nonetheless if there is some reason to believe the seizee is a witness to a crime. This is directly contrary to the Supreme Court's teaching in *Terry* that "[a]nything less [than reasonable articulable suspicion] would invite intrusions upon constitutionally guaranteed rights on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction." *Terry*, 392 U.S. at 22, 88 S.Ct. at 1880 (citing cases). No court—until now—has challenged this fundamental principle. The few state court cases on which my colleagues hang their respective hats—including *Wold*—adhere to the principles announced in *Terry* and consistently affirmed

thereafter; they require reasonable articulable suspicion that the person seized is a criminal suspect (in addition to the acknowledged possibility that the person seized may only be a witness). *See infra* pp. 487–88.

In announcing its new rule, the majority altogether ignores the Supreme Court's teachings on investigative seizures, which Judge SCHWELB calls not "in point." *Ante* at 479–80. The majority's decision not to look to those teachings for guidance is particularly troublesome because both Judge FARRELL and Judge SCHWELB acknowledge that Officer Schadt seized appellant during a criminal investigation. Neither judge in the majority adequately explains why investigative seizure principles under Supreme Court precedent do not apply.

For these reasons, elaborated below, I respectfully dissent from affirmance of appellant's conviction. The gun and ammunition were the fruits of an unlawful seizure and search. There is no record basis for allowing a seizure based on reasonably suspected criminal activity, and there is no legal basis for a seizure based on appellant's status merely as a possible witness.

## II.

The trial court concluded that Officer Schadt

> reasonably thought that that car could have been involved somehow in the shooting, either as the victim or as the shooter, certainly as a possible witness which, indeed, the people were.

Both Judge SCHWELB and I agree that the seizure was not supported by objective articulable facts that appellant and his companions had been involved in criminal activity. The trial court's conclusion, based on the officer's impression that appellant "could have been involved somehow ... as the shooter," is simply too speculative to meet the constitutional test of objective reasonableness under *Terry*.

I do not understand how my colleagues can combine (1) the possibility that appellant and his companions were witnesses to gunshots with (2) the unreasonable, nonarticulable suspicion that they "could have

been" shooters, and arrive at a reasonable seizure under the Fourth Amendment. I especially do not understand how the majority can arrive at this "constitutional" declaration without citing, interpreting, distinguishing, or grappling with even one Supreme Court case defining "reasonableness" under the Fourth Amendment in the context of investigative seizures. *See ante* at 476–78. In short, I decline my colleagues' invitation to embark *sua sponte, see supra* note 1, on a "voyage" without a compass into "the comparatively uncharted ... waters" of constitutional jurisprudence they attempt to navigate. *Ante* at 479.

### A.

I begin with several well established, consistently applied principles. " 'No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his [or her] own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.' " *Terry*, 392 U.S. at 9, 88 S.Ct. at 1873 (quoting ·*Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891)). The Supreme Court accordingly stressed in *Terry* that an "investigative seizure"—the type of seizure at issue in this case—must meet a constitutional test of reasonableness: "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the seizure. *Id.* 392 U.S. at 21, 88 S.Ct. at 1880.

Several years later, the Court specified that "[a]n investigatory stop must be justified by some objective manifestation that *the person stopped* is, or is about to be, *engaged in criminal activity.*" *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) (emphasis added); *see United States v. Montoya de Hernandez*, 473 U.S. 531, 541, 105 S.Ct. 3304, 3310, 87 L.Ed.2d 381 (1985); *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *Delaware v. Prouse*, 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979); *United*

*States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975); *Adams v. Williams*, 407 U.S. 143, 146–49, 92 S.Ct. 1921, 1923–25, 32 L.Ed.2d 612 (1972). And again: "the whole picture must yield a particularized suspicion ... that the particular individual being stopped is engaged in wrongdoing.... '[T]his demand for specificity is the *central teaching of this Court's Fourth Amendment jurisprudence.*' " *Cortez*, 449 U.S. at 418, 101 S.Ct. at 695 (citing *Terry*, 392 U.S. at 21, n. 18, 88 S.Ct. at 1880, n. 18) (emphasis in *Cortez*). This court has observed and upheld this fundamental principle in numerous cases. *See, e.g., Gomez v. United States*, 597 A.2d 884, 888 (D.C.1991); *Cauthen v. United States*, 592 A.2d 1021, 1022 (D.C.1991); *Galberth v. United States*, 590 A.2d 990, 995 (D.C.1991); *In re T.T.C.*, 583 A.2d 986, 989 (D.C.1990); *Smith v. United States*, 558 A.2d 312, 318 (D.C.1989) (en banc) (Ferren, J., concurring, with four other judges joining); *District of Columbia v. Gandy*, 450 A.2d 896, 900 (D.C.1982).

Judge SCHWELB complains that the cases cited and quoted above are not on point because they do not involve facts similar to those in this case. He then asserts that this dissent reflects a misunderstanding of "the nature and uses of judicial precedent, and therefore makes far too much out of too little." *Ante* at 480. All of those cases, however, announce fundamental constitutional principles in the same context we deal with here: investigative seizures by the police. I agree that the Supreme Court has never tested its *Terry* analysis by reference to the fact pattern at issue here, and thus the Court has not explicitly held that police seizure of suspected witnesses is unconstitutional. But this does not mean we can dismiss, without discussion, the Supreme Court's Fourth Amendment jurisprudence establishing that an investigative seizure, without probable cause, must be justified by a reasonable, articulable suspicion that the person seized has, been, or is about to be, engaged in criminal activity. The majority has the burden to show why this *Terry* limitation no longer should be honored. It has not attempted to meet that burden.

The part of Judge FARRELL'S opinion Judge SCHWELB joins does purport to rely on *Terry* caselaw to support the majority's proposition that, consistent with the Fourth Amendment, the police may seize witnesses when confronted with "rapidly moving street occurrence[s]." *Ante* at 474. But every one of the cases Judge FARRELL cites on pages 471 and 473-74 of his opinion involves investigative seizures of suspects of criminal activity, not witnesses.

Given the "sacred" and "carefully guarded" constitutional principles discernible from the Supreme Court's Fourth Amendment jurisprudence, *Terry*, 392 U.S. at 9, 88 S.Ct. at 1873, I believe Officer Schadt was required—before seizing appellant and his companions—to have had some specific, objective basis for believing they had participated in some way in the firing of the four gunshots. But Officer Schadt had no objective basis for believing that. Immediately after someone fired the shots, he radioed a lookout for another car from which he thought the four shots had been fired. Furthermore, when Officer Schadt crossed the intersection to take a closer look at what might be happening, he had no objective basis for stopping anyone in particular. He merely saw "people running all over the place," including appellant and his two companions who were getting into a parked vehicle. The officer explained that he had stopped appellant and his companions, rather than others who were also attempting to get away from the scene of the shooting, simply because they seemed to be trying to get away "more than anyone else." This scenario does not provide a sufficiently particularized suspicion of anyone for anything.

Judge FARRELL claims that this dissent "misapprehends" the facts of the case. He says that "Schadt heard gunshots from the direction of two cars fleeing (or attempting to flee) the scene" and that the officer, therefore, believed appellant was a member of one of two groups which had fired the shots. *Ante* at 475-76. An officer's subjective reasons, however, will permit a seizure only if they are based on objective articulable facts. That is *Terry*'s message. Objectivity is in; hunches are out.

Otherwise, any of us can be seized for anything on a police officer's whim.

Officer Schadt's own testimony establishes that he had no objective reason to stop appellant. Judge FARRELL downplays the fact that, at the suppression hearing, defense counsel played a tape of Officer Schadt's radio run in which the officer's belief at the time of the shooting—as expressed on the tape—was that the shots had been fired from the car that had immediately raced away. When confronted with that tape, Officer Schadt admitted he believed that night that an occupant of the car speeding away had fired the shots. *See ante* at 472 n. 4. That car—the subject of his suspicions—was gone by the time the officer approached appellant and his companions. Furthermore, there is no evidence that appellant was attempting to "flee," *ante* at 475, when the officer seized him, or that appellant had "the freshest information" about the shooting, *ante* at 477. In fact, Officer Schadt testified only that appellant was "standing by the car" when the officer first saw him and that appellant had just entered the car to drive away when the officer ordered him and his companions to stop and put their hands in the air.

I therefore agree with Judge SCHWELB that Officer Schadt lacked reasonable, articulable suspicion for believing appellant or his companions could be suspected of criminal activity. They were merely three among many who were attempting to retreat from an area where four shots apparently had just been fired. The officer's subjective impression that they were attempting to get away "more than" other bystanders was not a specific, objective fact giving rise to reasonable suspicion that any of them had been, or was about to be, "engaged in criminal activity." *Cortez*, 449 U.S. at 417, 101 S.Ct. at 695.

B.

Despite this conclusion—reflecting a 2 to 1 vote that should require reversal for lack of a valid *Terry* stop—my colleagues offer a pragmatic justification for finding the

officer's actions reasonable nonetheless. The majority looks for a way to empower the police with constitutional authority to seize citizens not reasonably suspected of anything more than being in the vicinity when someone else fired a gun four times. They search, in other words, for a way to make it constitutionally permissible for the police to seize citizens not reasonably suspected of any criminal, or even of any suspicious, behavior. This remarkable and far-reaching proposition is not based on any principled objective test that I can discern; rather, it is based on a rationale of "a rapidly moving street occurrence" backed by the scant authority of a sixteen-year-old model code never adopted by this jurisdiction, buttressed by one treatise, one state supreme court case, and several intermediate state courts of appeals decisions. These meager—and inapposite—authorities provide an insubstantial basis for the majority's erosion of the Fourth Amendment prohibition against unreasonable searches and seizures, especially in light of the explicit and contrary words of the Supreme Court in cases such as *Cortez, Prouse, Brignoni–Ponce, Montoya de Hernandez, Brown,* and *Adams.*

After reviewing each of the majority's authorities, I find no "firm constitutional basis," *ante* at 477, for allowing seizure of citizens simply because they are near the scene of the crime and thus may be eyewitnesses or complaining witnesses. Furthermore, a close reading of the cases the majority relies on discloses that they—in one form or another—require reasonable, articulable suspicion the person seized was engaged in criminal activity. In other words, they are *Terry* cases. But even if this court were to adopt the principle that under certain limited circumstances the police could justifiably seize witnesses—a principle I cannot accept as consistent with the Constitution—the facts of this case do not even fit within the circumstances required by the few authorities the majority cites for this remarkable proposition.

Judge FARRELL cites the Model Code of Pre–Arraignment Procedure—which neither Congress nor the Council of the District of Columbia has ever adopted—as constitutional authority for the permissible seizure of witnesses. *See ante* at 476–77. This 1975 Model Code states that witnesses near the scene of a crime involving danger to persons or property may be stopped if "the officer has *reasonable cause* to believe that [the witness] has knowledge of material aid in the investigation of such crime." MODEL CODE OF PRE-ARRAIGNMENT PROCEDURE § 110.2(b) (1975) (emphasis added). Judge FARRELL fails to cite one statute or case that specifically adopts this provision of the Model Code. Moreover, my colleague never addresses the Code's "reasonable cause" requirement, which obviously imposes a higher standard for seizing witnesses than reasonable, articulable suspicion under *Terry.* Thus, Judge FARRELL never attempts to apply the "reasonable cause" requirement to the facts of this case.[5]

Judge SCHWELB, for his part, never expressly indicates what standard he adopts for seizing witnesses. Whatever it is, however, appears to be lower than a "reasonable cause" standard and seems to be based on dicta quoted from *Wold,* 430 N.W.2d at 174–75. *See ante* at 479. The citations and footnote Judge SCHWELB has omitted from his extended quotation from *Wold* are telling. Those citations and footnote reveal that, in *Wold,* the Minnesota Supreme Court referred in dicta to the "freeze the scene" principle articulated in W. LAFAVE, 3 SEARCH & SEIZURE § 9.3(d), at 461; the court did not cite the Model Code of Pre–Arraignment Procedure provision expressly adopted by Judge FARRELL. Section 9.3(d) of LaFave's treatise adds a limitation not found in the Model Code; it requires a "reasonable possibility" that at least someone among the small group of persons seized is a suspect of criminal activity. *See supra* note 4. Judge SCHWELB

---

5. Although it is not entirely clear, "reasonable cause" most likely requires the same quantum of proof as "probable cause." From the record, it does not appear that Officer Schadt had rea-

sonable or probable cause to believe appellant was doing anything but trying to get away from an area where four shots had just been fired.

overlooks that limitation, for he does not claim, as Professor LaFave would require, that Officer Schadt had a reasonable basis for believing at least someone the officer seized—appellant or one of his companions—had engaged in criminal conduct.[6]

Apparently, therefore, since Judge SCHWELB ignores Professor LaFave's § 9.3(d) limitation, both of my colleagues believe that the police, consistent with the Fourth Amendment, may seize any possible witness, within the limited constraints of the Model Code of Pre–Arraignment Procedure (1975), given reasonable cause (or less?) to believe that the seizee has witnessed a crime. No case—until this one—so holds.

### C.

Even if we were to overlook the puzzling inconsistencies between the majority members in formulating the standard for seizing witnesses, the cases on which the majority relies do not meet the majority's needs. They show, rather, that the police had objective, specific information that the persons seized had been directly involved in recently completed crimes.

In *Metzker v. State*, 797 P.2d 1219 (Alaska Ct.App.1990), a bystander had informed a police officer that a woman, who had just hitched a ride with appellant, had been assaulted and was probably injured.

Based on that specific information and the exigent circumstances of the woman's probable injury, the court upheld the stop of appellant's truck and his unrelated arrest for drunk driving. *See id.* at 1221–22. In *Wold*, on which the majority relies most heavily, and which I have already summarized, the court found a *Terry* basis for the appellant's seizure and referred to seizing witnesses only in dicta. Similarly, in *Appelgate v. Commissioner of Public Safety*, 402 N.W.2d 106 (Minn.1987), *cited with approval in Wold*, the court relied on six factors for determining whether the police had sufficiently detailed information to justify stopping a vehicle near the scene of a recently committed burglary. *Id.* at 108 (citing W. LaFave, *supra*, § 9.3(d), at 460 (seizure of person near scene of recent crime when police have information or description that such person may have been involved)). The court concluded that the officers had "reasonable articulable suspicion" for stopping the appellant *as a suspect. Id.* at 107–108. Finally, *Metcalf v. Long*, 615 F.Supp. 1108, 1114 & n. 5 (D. Del.1985), provides no support for the majority's analysis. The court there noted the uncertain authority for seizing suspected witnesses and accordingly upheld the police seizure of appellant based on reasonable suspicion that appellant himself was engaging in criminal activity.[7]

---

**6.** Judge SCHWELB asserts that I have "juxtapos[ed] two unrelated passages located in different parts of the same treatise." *Ante* at 480 n. 4. Those two passages, quoted *supra* at note 4, are related in this way: The first, from § 9.2(b) of Professor LaFave's treatise, quotes from the Model Code on which Judge FARRELL relies. The second, from § 9.3(d) of the same treatise, is quoted in the passage in *Wold* on which Judge SCHWELB relies. Thus, Judge SCHWELB himself relies on § 9.3(d) because he quotes from *Wold*, which relied on it. Although Judge FARRELL, as well as Judge SCHWELB, purports to rely on *Wold*, that case itself only cites § 9.3(d) of LaFave's treatise; *Wold* never mentions the Model Code. This suggests the question, which my colleagues never address, whether the Model Code and § 9.3(d) are reconcilable. It is unclear whether Professor LaFave, in § 9.3(d), intends to import into the Model Code (discussed in § 9.2(b)) a limitation not found there—that the police must reasonably believe at least one of the small group of persons seized committed a crime—or

instead intends to say that in his own opinion, without reference to the Model Code, that a *Terry*-type limitation on seizing witnesses should apply.

Whatever Professor LaFave intends, it would appear that both of my colleagues would not require the § 9.3(d) limitation, since Judge FARRELL purports to rely primarily on the Model Code, which does not expressly contain the limitation, and Judge SCHWELB, even if relying on § 9.3(d) by citing *Wold*, effectively repudiates the limitation by acknowledging that Officer Schadt did not have reasonable, articulable suspicion that at least one of the persons seized, appellant or a companion, had engaged in criminal activity. As it turns out, therefore, both of my colleagues effectively adopt the Model Code, without limitation—and not the approach discussed in *Wold*.

**7.** In *Keeton v. State*, 427 So.2d 231 (Fla.Dist.Ct. App.1983) (per curiam), the intermediate appellate court, in a three paragraph opinion, found

The majority's ruling, therefore, does not follow from the few authorities on which my colleagues rely.

## D.

The matter gets even worse. The majority refuses to acknowledge the additional invasion of privacy many possible witnesses are likely to suffer after seizure. Upon restraining such witnesses' liberty, the police—based on long-established Fourth Amendment principles arising from legitimate concerns for police safety—presumably may then "frisk" or search such witnesses for weapons. *See, e.g., Terry,* 392 U.S. at 25–26, 88 S.Ct. at 1882. Judge FARRELL writes that the majority "expressly do[es] not consider whether a witness detained under the circumstances we describe could be searched." *Ante* at 477 n. 16. In this case, of course, the appellant's furtive gesture resulted in a search which the majority obviously sustains. But even absent a furtive gesture, it is inconceivable to me that a police officer—confronting a possible witness whom the officer is entitled to seize under the majority's scheme—will not frisk that person out of a concern for personal safety when the confrontation takes place, for example, in a so-called high crime neighborhood at night. How can we realistically tell an officer yes, by all means feel free to seize without *Terry* justification, but do so at your own peril?

The regime announced by the majority has opened the proverbial Pandora's box of unanswered questions that can only be addressed after the police push more and more beyond traditional constitutional protections. This court, today, not merely tolerates but invites governmental invasion of the freedom and privacy of citizens not reasonably suspected of any criminal activity, all in the name of investigative expediency. To this I cannot agree.

As the Supreme Court has emphasized: "it is simply fantastic to urge that [a pat

down search or frisk] performed in public by a police officer while the citizen stands helpless, perhaps facing a wall with his [or her] hands raised, is a 'petty indignity.' It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." *Terry,* 392 U.S. at 16–17, 88 S.Ct. at 1877. With all due respect, this is precisely what the majority's pragmatism does. It takes far too lightly the balance of reasonableness mandated by the Fourth Amendment, as interpreted by the Supreme Court, and in effect condones the seizure and resulting search of persons not reasonably suspected of anything but witnessing another's crime.

## E.

Although Officer Schadt may have legitimately believed there was a need for "immediate police action" because of a "rapidly moving street occurrence ... involving a dangerous weapon," *ante* at 471 (quoting *Rushing v. United States,* 381 A.2d 252, 256 (D.C.1978)), a police officer's need for action does not somehow take that officer's conduct outside established principles delineating the scope of constitutionally permissible seizures. The entire rationale of constitutional reasonableness under *Terry* is premised on "rapidly moving street occurrences" where the police must act before waiting for probable cause to arrest in order to detect or deter criminal behavior. *See Terry,* 392 U.S. at 20, 88 S.Ct. at 1879 ("[W]e deal here with an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observation of the officer on the beat....."). In fact, all of the cases Judge FARRELL cites for the majority's "exigent circumstances" rationale for seizing witnesses are cases involving reasonable suspicion of suspects, not witnesses.

Under *Terry,* if Officer Schadt reasonably had thought appellant and his companions were involved in criminal activity, he

it reasonable for the police to detain appellant near the scene of a recently completed crime after appellant told police that he had witnessed the flight of persons fitting the description of the alleged perpetrators. The fact that appellant

had "waived his constitutional rights" and that his answers to investigatory questions led to probable cause for the police to arrest him for the crime, *id.* at 232, may have contributed to this ruling, which is far from clear.

would have had a legitimate justification for stopping them as suspects. On the other hand, because the officer's objective information indicated only that they were possible witnesses because they were near the scene of a possible crime, other methods of police investigation short of seizing them were available.[8] Because "[a]n innocent person might have reacted no differently [from appellant] in the circumstances," and because none of Officer Schadt's observations before seizing appellant added any "independent information compensating for the generality" of his knowledge that someone in the area had just fired a gun four times, he had no legitimate objective basis for seizing appellant. *Cauthen v. United States*, 592 A.2d at 1025.

Furthermore, this was not a situation where the police made "[a] brief stop of a *suspicious* individual, in order to determine his [or her] identity or to maintain the status quo momentarily while obtaining more information." *Adams v. Williams*, 407 U.S. at 146, 92 S.Ct. at 1923 (emphasis added), *cited in Stephenson v. United States*, 296 A.2d 606, 609 (D.C.1972), *cert. denied*, 411 U.S. 907, 93 S.Ct. 1535, 36 L.Ed.2d 197 (1973); *see District of Columbia v. Gandy*, 450 A.2d 896, 900 (D.C.1982) (purpose of privilege to stop suspicious persons under *Terry* "is to enable police officers to maintain the status quo while gathering more information"). Because the person or persons whom Officer Schadt suspected of firing the shots had fled the scene, and other persons were "running all over the place," there was no "status quo" to maintain, and certainly no basis for believing appellant was a "suspicious individual." Additionally, there was no evidence that appellant and his companions were fleeing the scene for any reason other than the common sense desire to leave after someone else had fired a gun nearby. And, there is no basis for inferring that they were attempting to flee a show of authority. Indeed, Officer Schadt's first show of authority was to order them to stop and put their hands in the air. There accordingly was no implied consciousness of guilt to add to the reasonable seizure calculation.

Finally, the majority makes much of the fact that a "violent" crime had just taken place. Although gunfire obviously is strong evidence of a crime of violence, this is not a case like *Wold*, where the police officer arriving on the scene had observed (1) a wounded victim and (2) the person subsequently seized at the scene acting suspiciously. In any event, *Terry* and its progeny have always set the required constitutional standard to apply when "swift action" is required "predicated upon the on-the-spot observation of the officer on the beat." 392 U.S. at 20, 88 S.Ct. at 1879. Officer Schadt saw nothing that would warrant the intrusion he imposed—which, in breaking new legal ground, the majority unfortunately justifies.

### III.

In reaching out to establish a new constitutional principle for the District of Columbia, neither Judge FARRELL nor Judge SCHWELB acknowledges or explores the obvious slippery slope he creates, given "the reality of the street." *Ante* at 481. In a city where, tragically, shots ring out all the time, this slope may lead to a dangerous descent from reasonable police actions to a point where the police can round-up for nonconsensual questioning anyone who lives in, who is visiting, or who is just passing through high crime (and hence im-

---

8. For example, the officer could have attempted a consensual encounter with appellant and his companions. Alternatively, the officer could have written down the car's license number and later contacted the owner if further investigation on the scene, including consensual interviews of bystanders, showed that appellant or his companions had been directly involved in a shooting. That this allows an investigating officer to do more than "twiddle his thumbs" as Judge SCHWELB puts it, *ante* at 481, is self-evident.

But even more to the point, there are constitutional norms—long adhered to—that prevent the police from seizing people short of reasonable suspicion, no matter how tempting an exception based on mere intuition may be. We impose constitutional limits on the police power to investigate crime in order to protect us all against an overly intrusive State Investigator.

poverished and non-white) areas at an unfortunate time when the police hear gunfire or, presumably, hear or observe any other incident indicating criminal activity. As the Public Defender Service points out in its *amicus* brief, the majority may be opening the door for the police to justify virtually any on-the-scene detention (and subsequent search)—later determined not to measure up to *Terry* standards—on the ground that it measures up to the lower "*Williamson* standard": the person detained was nearby when a "violent" crime may have taken place and therefore might have known something about it.[9]

Neither the Supreme Court nor this court has ever countenanced this vision of Fourth Amendment "reasonableness" where the government need only plead "fast-moving events" to justify seizing someone near the scene of a suspected "violent" crime merely because that person might know something about the crime. *Cf. Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979) (a person's mere proximity to others suspected of criminal activity does not give rise to reasonable suspicion justifying search and seizure); *Brown*, 443 U.S. at 51–52, 99 S.Ct. at 2640–2641 (police had no justification for seizing appellant observed walking away from another man in area known for drug traffic); *Smith v. United States*, 558 A.2d 312, 314–15 (D.C. 1989) (en banc) (discussing with approval cases in which courts have refused to justify seizures predicated upon proximity to suspicious individuals); *Johnson v. United States*, 468 A.2d 1325, 1327 (D.C.1983) (police had no legitimate basis for compelling driver of car to "come here" where driver and friends were sitting in car late at night in high crime area), *rev'd on other grounds*, 496 A.2d 592 (D.C.1985).

Let us be clear: in allowing seizures of possible witnesses—none of whose seizures could be justified under *Terry* by reasonable, articulable suspicion of participation in past or impending criminal activity—the majority today announces a new, radical rule of law. This ruling, with its implications, requires careful scrutiny and public discussion, for this court is eroding traditional constitutional rights without a signal from the Supreme Court.

The incredible, and truly sad, irony of the majority's result is that it now appears easier for the state to seize someone as a "possible witness" in a "fast-moving situation" than it is to seize someone suspected of a crime under *Terry*'s reasonable articulable suspicion requirement. To that I must emphatically dissent and hope for a better day. I vote to reverse.

---

9. Judge FARRELL suggests that by adhering to what I see as fundamental constitutional principles we would be encouraging the police to lie under oath and not admit they have seized citizens because they are not sure whether they are witnesses or suspects. *See ante* at 477. But if the police have reasonable articulable suspicion that someone is a suspect, they already have constitutional authority under *Terry* to stop them. Therefore, I believe it is the majority's outcome that will encourage police officers to ignore the law: under the majority's regime, the police can skip past the *Terry* requirement of reasonable articulable suspicion for investigative seizures and seize someone merely on the basis of "exigent circumstances" as a "possible witness."