Ronnie L. **HAWKINS**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 93–CF–813.

District of Columbia Court of Appeals.

Argued Nov. 16, 1994.
Decided Aug. 17, 1995.

---

**1222**

Joseph Virgilio, appointed by the court, Glendale, CA, for appellant.

Mark J. Carroll, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and John F. Cox, Assistant United States Attorneys, Washington, DC, were on the brief, for appellee.

Before FARRELL and KING, Associate Judges, and MACK, Senior Judge.

MACK, Senior Judge:

This appeal presents a seizure issue involving the victim of criminal activity who was approached by the police for questioning. Because the conduct of the police officers did constitute a "seizure" within the meaning of the Fourth Amendment and because the officers acted without "articulable suspicion," probable cause, or any other legal justification for the seizure, the motion to suppress should have been granted.

## I.

Following his indictment for carrying a pistol without a license,[1] possession of an unregistered firearm,[2] unlawful possession of ammunition,[3] unlawful possession with intent to distribute cocaine while armed,[4] unlawful possession of marijuana,[5] and possession of a firearm during a crime of violence or dangerous offense,[6] appellant moved to suppress all tangible evidence recovered from his person, and all statements made to the police,[7] on the ground that he had been illegally seized by

1. D.C.Code § 22–3204(a) (1995 Supp.).

2. D.C.Code § 6–2311 (1989 Repl.).

3. D.C.Code § 6–2361(3) (1989 Repl.).

4. D.C.Code § 33–541(a)(1) (1988); D.C.Code § 22–3202 (1995 Supp.).

5. D.C.Code § 33–541(d) (1988).

6. D.C.Code § 22–3204(b) (1995 Supp.).

7. We agree with the government that appellant's argument concerning the suppression of his statements made to the police is moot since these statements were not used by the government in its case-in-chief or in its rebuttal case.

police officers acting without articulable suspicion or probable cause. At the suppression hearing, the following testimony, credited by the trial judge, was given by the officers involved.

Around 7:00 p.m., on June 25, 1992, Officers Douglas Reynolds and Diedre Barnes, assigned to the Metropolitan Police Department's Warrant Squad, were at the intersection of Mount Olivet Road and Capital Avenue, N.E., in an unmarked police car, when appellant's vehicle made a left turn in front of them. Reynolds, the driver, made a U-turn and followed appellant to the 1300 block of Galludet Street, N.E. Reynolds had recognized appellant as the complainant in a pending assault case involving two separate incidents which had occurred a few weeks earlier, and he wanted to ask appellant some questions concerning the identity of his attackers.[8] By the time the officers reached appellant's vehicle, the car was stopped and appellant was talking to some females.[9]

Reynolds "pulled casually alongside of him" and asked if he could talk to appellant who "was cordial and said sure."[10] Reynolds, who was dressed in plain-clothes and was not displaying a weapon, approached appellant (who was still seated in the driver's side of his car), and identified himself by flashing his badge.[11] Meanwhile, Officer Barnes, who was also in plain-clothes and who was not displaying a weapon, approached appellant's car from the passenger side and remained there observing appellant.[12]

Reynolds asked appellant if he knew who had shot him or who had come to the hospital to "finish him off" and appellant said "no." Then, based on what Reynolds termed "instinct" and "past dealings with the situation with [appellant]," Reynolds asked appellant "was he packing anything."[13] Appellant said "no" and the conversation concerning the pending assault case continued. At this time, Barnes signaled Reynolds by patting her right thigh with her right hand (meaning

8. Appellant had been shot and then subsequently threatened by several men with ice-picks while he was being treated at a hospital for a gunshot wound. During cross-examination, Reynolds testified that he had not made any effort to interview appellant concerning these incidents prior to June 25th, although he knew appellant and had interviewed him previously about other matters.

9. Although Reynolds denied that he "stopped" appellant, he admitted on cross-examination that the PD–163 report, which *he prepared* within twenty-four hours of arresting appellant, stated: "The undersigned officer and partner *stopped* the defendant who was operating a 1983 Volkswagen Rabbit...." (Emphasis added.) Reynolds further admitted during cross-examination that the same information was offered in a sworn statement and that it did *not* mention that appellant was already stopped and talking with some females when the officers approached him. Under questioning by the court about the use of the word "stopped," Reynolds explained: "[T]he stop I believe I am trying to refer to in that was a contact type of stop, not that he was stopped for any illegalities at that time."

During his own testimony, appellant denied that he was already parked on Galludet Street talking to some females when the officers pulled alongside him. Appellant stated that he had not brought his car to a stop prior to being pulled over because he was on his way to the gas station.

10. According to appellant's own testimony, Officer Reynolds pulled alongside appellant and

yelled "pull it over, pull it over, I want to talk to you right now."

11. On cross-examination, Reynolds altered his version of the events. He testified that after appellant said he would speak with him, he asked appellant to pull his car over from the middle of the street and when appellant pulled his car into a parking space, both officers got out and approached him. Reynolds then excused himself to move his car out of the middle of the street and parked it "about a half a car length in front of" appellant's car. Sometime after returning to appellant's car, Reynolds asked appellant to turn off the ignition. By contrast, Barnes, also during cross-examination, denied that Reynolds moved the car after the officers alighted to speak with appellant.

12. During cross-examination, Barnes admitted that her position at the passenger side of the vehicle and Reynold's position at the driver's side conformed with their training for making a traffic stop.

13. According to appellant's testimony, after Reynolds showed his badge, he asked appellant if he remembered him and appellant said, "yeah, I do, what seems to be the problem Mr. officer man?" Then, Reynolds began asking him questions about the shooting, demanding that he tell the officer who was trying to kill him. Reynolds was cursing and yelling and he told Barnes to look around because appellant was known to carry a gun.

she believed that appellant had a weapon on him). Understanding this signal, Reynolds asked appellant for a second time if he was "packing." Appellant responded by removing some money from his pocket and telling Barnes that all he had was some money; he then returned the money to his right front pocket.[14] Reynolds asked appellant for a third time, "[A]re you sure you're not packing?" At that point, Barnes walked around to the driver's side of the car and told Reynolds to remove appellant from the car.[15]

As appellant exited the car, Reynolds saw the butt of a gun in his right front pocket. He placed appellant's hands on the top of the car and Barnes retrieved the gun. Subsequent to the arrest, Reynolds recovered six packs of marijuana and seventeen packs of crack cocaine from appellant's left front pocket.

In denying the motion to suppress, the trial court credited the testimony of both officers and discredited appellant's testimony. The trial judge made the following oral findings of fact and conclusions of law:

> In my view, the issue really squarely is one of credibility....

> \*   \*   \*   \*   \*   \*

> [T]he Court rejects the proposition that having asked Mr. Hawkins three times under the circumstances whether he was packing a gun was anything other than

reasonable ... and certainly did not constitute any type of stop....

> \*   \*   \*   \*   \*   \*

> Furthermore, there's nothing else that these officers did ... which would make this encounter with Mr. Hawkins anything but legal.

> [O]n the issue of credibility the Court resolves in favor of the Government. Frankly, the Court does not believe Mr. Hawkins' recitation of these events.

> The Court has taken into consideration matters which do impeach the testimony of the police officers.... Both officers testified or wrote that they stop and used the word "stopped" Mr. Hawkins.

> \*   \*   \*   \*   \*   \*

> Frankly this police officer, Officer Reynolds, demonstrated in his use of words not the best ability to manipulate language. And the Court simply chooses to not have this inconsistency be a litmus test for credibility on this, on this issue.

> The other inconsistency has to do with seeing the bulge, seeing the handle versus seeing the butt, bulge.... [The Court mentioned a third inconsistency.]

> \*   \*   \*   \*   \*   \*

> [O]ne must also consider whether they [the inconsistencies] pertain to matters of important versus unimportant detail and re-

---

**14.** During her testimony, Barnes stated that at first she was smoking a cigarette and was not paying attention to the conversation between Reynolds and appellant. She claimed that the part of the conversation that got her attention was when she heard her partner ask appellant if he was packing (from the record taken as a whole, this would be the *second time* Reynolds had asked this question). At this point, appellant became "agitated" and pulled out some money. As appellant put the money back in his pocket, Barnes testified that she saw "the *butt* of the gun in the right-hand side of his front pocket" (emphasis added). It was then that she signaled Reynolds by patting her pocket. However, according to Reynold's testimony, as stated in the text, Barnes signaled Reynolds *prior to* appellant pulling the money out of his pocket.

Furthermore, Barnes admitted during cross-examination that the property record that she prepared after appellant's arrest correctly stated: "While standing on the passenger side of the vehicle observing the defendant I noticed a *bulge*

on his right, on his side, which at that time I signaled my partner...." (Emphasis added.) After hearing this read to her, Barnes responded: "I left the part out about the money when he reached into his pocket and showed me the money and put it back in. That's the only thing that's wrong with that statement."

During his testimony, appellant denied taking any money out of his pocket while he was being questioned by Reynolds.

**15.** According to appellant's testimony, Reynolds told Barnes to get him out of the car at which time Barnes came around to the driver's side of the car, put her gun in his face and told him to get out. This occurred after Reynolds told Barnes to look around because appellant was known to carry a gun. See note 13, *supra.* Appellant stated: "I had already been shot and I didn't want to get shot from close range like that, so I got out the car."

sult from innocent error or intentional falsehood and the like.

And again, the Court having considered those inconsistencies just does not believe they undercut the truthfulness of these officers' testimony.

On the other hand, I just must say Mr. Hawkins' version of events just does not ring true in my view....

\*     \*     \*     \*     \*     \*

[O]ne, Mr. Hawkins' version of events simply was not corroborated. Two, Mr. Hawkins has been previously convicted of a crime. Three, ... [appellant's] stake in this proceeding ... is much, much greater than the police officers.

## II.

■ Our scope of review for an order denying a motion to suppress evidence is set forth in D.C.Code § 17–305(a) (1989).[16] "We are bound by the trial court's factual findings unless clearly erroneous *or* not supported by the evidence." *Powell, supra,* note 16, 649 A.2d at 1084 (quoting *Holston v. United States,* 633 A.2d 378, 386 n. 10 (D.C.1993)) (emphasis added). Furthermore, in reviewing the trial court's denial or grant of a motion to suppress, this court's review is *de novo. See, e.g., Lewis v. United States,* 632 A.2d 383, 385 (D.C.1993); *Gomez v. United States,* 597 A.2d 884, 889 (D.C.1991).

## III.

■ Our inquiry in this case is two-fold. First, we must determine whether appellant was "seized" within the meaning of the Fourth Amendment. And second, if appellant was in fact "seized," we must determine whether there was "articulable suspicion" or probable cause of criminal activity, or some other legal basis for the seizure. As we recently stated in *In re J.M.,* 619 A.2d 497

(D.C.1992) (en banc), "The crucial test for determining whether a person has been seized is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Id.* at 499–500 (quoting *Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991)) (internal quotations and emphasis omitted) (citations omitted).[17] Moreover, an initially consensual encounter can be transformed into a seizure and detention within the meaning of the Fourth Amendment if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave. *I.N.S. v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984).

■ Generally speaking, any restraint of a person amounting to a "seizure" is invalid unless justified by probable cause. *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). However, certain seizures are valid if there is "articulable suspicion" that a person has committed or is about to commit a crime. *Id.* (discussing the limited exception, established by *Terry v. Ohio, supra,* note 17, and its progeny, to the probable cause requirement). In any event, the Supreme Court has made it clear that an individual "may not be detained even momentarily without reasonable, objective grounds for doing so." *Id.*

■ In the present case, even assuming *arguendo* that appellant's initial decision to speak with the officers was consensual, the officers, early in this encounter, adopted a posture displaying their authority which communicated very clearly to appellant that he was not free to simply ignore them and

---

16. "When the case was tried without a jury, the court may review both as to the facts and the law, but the judgment may not be set aside except for errors of law *unless* it appears that the judgment is plainly wrong or *without evidence to support it.*" D.C.Code § 17–305(a) (1989 Repl.) (emphasis added); *see also Powell v. United States,* 649 A.2d 1082, 1084 (D.C.1994).

17. *See also Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968) ("Only when the officer, by means of physical force or *show of authority,* has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.") (emphasis added).

leave.[18] According to the testimony of both officers, appellant's car was double parked with its engine running when they initially approached him. It remained in that position *after* appellant agreed to speak with the officers. Officer Reynolds directed appellant to park his vehicle, and, at some point, asked appellant to turn off his ignition. Upon approaching appellant, Reynolds displayed his badge and then both officers positioned themselves on either side of the car. Noteworthy is Officer Barnes' testimony that the officers' positioning themselves on both sides of the car conformed with their training for making a traffic stop.[19] Any objective belief that appellant was free to leave was further negated by Reynold's repeated questioning about whether appellant was carrying a weapon.[20] Given the totality of the circumstances presented in this case, a reasonable person subjected to such a "show of authority" would not have felt free "to ignore the police presence and go about his business." *In re J.M., supra,* 619 A.2d at 499–500; *see also* note 18, *supra.* One can only conclude that a "seizure" had occurred within the meaning of the Fourth Amendment.

■ Most cases examining the legalities of police seizures initiated for investigatory purposes focus exclusively on suspects and thus require at least "articulable suspicion." *See, e.g., Florida v. Royer, supra,* 460 U.S. at 498, 103 S.Ct. at 1324 ("reasonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning *limited to* the purpose of the stop") (referring to *United States v. Brignoni–Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975) (emphasis added)). Some courts, including ours, however, have examined situations in which police officers have initiated similar encounters with witnesses. In *Williamson v. United States,* 607 A.2d 471 (D.C. 1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 96, 126 L.Ed.2d 63 (1993), we stated that "the police are justified in stopping witnesses only where *exigent circumstances* are present, such as where a crime has recently been reported." *Id.* at 476 (internal quotations and citations omitted) (emphasis added). We also voiced our agreement with Professor LaFave's characterization of the Model Code of Pre–Arraignment Procedure: Any authority to detain witnesses must be "much more narrowly circumscribed" than the authority to stop suspects. *Id.* Judges Farrell and Schwelb—a majority of the division—agreed that the officer's action in stopping a fleeing Williamson to conduct an on-the-scene inquiry about a just-completed crime of violence was reasonable and, thus, did not violate the Fourth Amendment. *Id.* at 479 (Schwelb, J., concurring). In the lead opinion, Judge Farrell expressly declined to address the issue of whether a potential eyewitness could be stopped under circumstances less demanding of immediate police action.[21] This is that case. As we note below, here there was no

---

**18.** While the test for determining a "seizure" is an objective one, whether a person has consented to a search (or a seizure) is a subjective one. *In re J.M., supra,* 619 A.2d at 500 ("all of the circumstances must be considered including *both* the nature of police conduct and 'the possibly vulnerable subjective state of the person who consents'") (citations omitted). Given appellant's prior criminal convictions (admitted to during cross-examination) and given appellant's testimony that he was told to pull over, appellant's "consent" was arguably not given voluntarily.

**19.** See note 12, *supra.*

**20.** Although police questioning in and of itself does not constitute a seizure, if this questioning loses its consensual nature or if the police "convey a message that compliance with their requests is required" then a seizure has occurred. *Florida v. Bostick, supra,* 501 U.S. at 435, 111 S.Ct. at 2386. The repeated questioning occurring within the context of the officers' overall conduct restraining appellant's apparent freedom to leave, discussed above, certainly appears to convey a message that "compliance" was "required" because each time appellant answered the question in the negative the same question was asked a few moments later. It was as if the officers said to appellant, "we are going to ask you this question until you tell us the answer we want to hear."

**21.** Limiting police authority to stop witnesses to "exigent circumstances" is both necessary and essential because of "the additional invasion of privacy many possible witnesses are likely to suffer *after* seizure [*i.e.,* the "frisk" or search of such witnesses for weapons]." *Williamson, supra,* 607 A.2d at 488 (Ferren, J., dissenting). Judge Ferren discussed the dichotomy between seizing individuals suspected of criminal activity and witnesses not so suspected. *Id.* at 488–89.

fast-moving scenario, no just-completed crime, and no flight. Moreover, other methods of police investigation short of seizure were readily available.[22]

■ It is very clear that there were no "exigent circumstances" in this case (as there were in *Williamson* ) to justify the officers' detention of appellant for questioning. In *Williamson,* when the officer on duty stopped the defendant's vehicle, it was in the early morning hours and dark (3:45 a.m., on March 25th), a potentially violent crime had just been completed (the officer heard gun shots from the direction of two cars), and there was fleeing activity (one car immediately fled the crime scene and Williamson's car was in the process of fleeing). *Williamson, supra,* 607 A.2d at 472, 475. By contrast, when the officers stopped appellant's car, there was daylight (7:00 p.m., on June 25th), no crime of any nature had just occurred, and there was no fleeing activity. In fact, neither officer expressed any concern that appellant would leave the jurisdiction or that he had been uncooperative when questioned in the past about other matters.

■ Even where the police have reasonable suspicion of criminal activity, their seizure of a suspect must be temporary and their questioning must be limited to the purpose of the stop. *Florida v. Royer, supra,* 460 U.S. at 498, 103 S.Ct. at 1324 (citing *United States v. Brignoni–Ponce, supra,* 422 U.S. at 881–82, 95 S.Ct. at 2580).[23] In the present case, the police stopped appellant to question him about his attackers in his pending assault case.[24] Therefore, it logically follows that the scope and duration of their questioning should have been limited to this purpose unless "articulable suspicion" or probable cause of criminal activity by appellant developed *during* the encounter. Officer Reynolds testified that he began his repeated questioning of appellant about whether he was carrying a weapon because of "instinct" and because of his "past dealings" with appellant. However, this falls short of the requisite "articulable suspicion" or probable cause: "There must be something at least in the activities of the person being observed or in his surroundings that affirmatively suggests particular criminal activity, completed, current, or intended." *Sibron v. New York,* 392 U.S. 40, 73, 88 S.Ct. 1889, 1907, 20 L.Ed.2d 917 (1968) (Harlan, J., concurring).[25] Both officers admitted that appellant agreed to speak with them, was cooperative and remained seated in his car. Their testimony indicated no specific observations of appellant during this encounter which would reasonably lead to the conclusion that appellant had a weapon.[26]

## IV.

Appellant was the *victim* of, *not a suspect* of, criminal activity. Thus, especially in light of our analysis in *Williamson* and the fact

22. Here it is particularly noteworthy that other investigative methods short of seizure had not even been attempted. During cross-examination, Officer Reynolds admitted that he had not made any effort to interview appellant concerning his pending assault case prior to June 25, 1992, although he knew appellant and had interviewed him previously about other matters. See note 8, *supra.*

23. Furthermore, "[i]t is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Florida v. Royer, supra,* 460 U.S. at 500, 103 S.Ct. at 1326.

24. Although the police officers' use of the term "stop" is inconsistent during the proceedings below, it is clear from the record that Officer Reynolds told appellant to park his car and turn off his ignition. And thus, it is fair to conclude that the officers stopped and/or detained appellant, at least temporarily.

25. Although a gun and illegal substances were eventually recovered from appellant, this court has previously held that the end result can *never* justify the constitutionality of the circumstances leading to the recovery of the evidence. *Brown v. United States,* 590 A.2d 1008, 1013 (D.C.1991).

26. Officer Barnes offered inconsistent testimony about whether she saw a "bulge" in appellant's pocket or whether she saw the "butt" of a gun prior to directing appellant to get out of his car. See note 14, *supra.* We do not need to resolve or address this inconsistency, however, because it is clear from the record that Officer Reynolds had asked appellant twice whether he was "packing" *prior to* Barnes' observations of appellant; and thus, this repeated questioning had no legal justification. *Id.*

that other less intrusive investigative methods were readily available to and had not been previously attempted by the police, the officers' decision to stop or detain appellant created an illegal "seizure" of appellant. The police officers' conduct in directing appellant to park his car and to turn off his ignition, and in positioning themselves as if they were engaging in a traffic stop, communicates to a reasonable individual that he is not simply free to ignore the police presence and go about his business. And given the totality of the circumstances presented by this case, the officers' insistent and repeated questioning of appellant provides further evidence that appellant was "seized" within the meaning of the Fourth Amendment.

Finally, in my view, the trial court's reasoning leading to its decision to basically ignore the factual inconsistencies in the officers' testimony and to totally discredit appellant's testimony is not persuasive. First of all, these inconsistencies—especially concerning the use of the word "stopped" and the use of the words "butt" and "bulge"—were matters of *important* detail whose accuracy was better judged as having been recorded shortly after the encounter occurred as opposed to subsequent recitations in the trial court setting. Second, while appellant was definitely not the ideal witness, the fact that his version of the events was not corroborated is of little, if any, significance since he was alone in his car during the encounter. Moreover, the fact that one has been previously convicted of a crime is not an absolute justification for totally discrediting one's testimony. And finally, the fact that one charged with a crime might have a greater stake than police officers in the outcome of a proceeding should not operate *per se* to tilt the balance of credibility. Police officers likewise have a high stake in maintaining their good and respectable image as protectors of the public. Illegal searches or seizures are not to be taken lightly.

In any event, even assuming *arguendo* that the officers' testimony is credible and that appellant's testimony is not credible, I would find that the factual inconsistencies and other testimonial admissions are significant and that as a whole the record does not support the trial court's factual findings. Moreover, I agree with Judge Farrell, most certainly, that the repeated questioning about the possession of a weapon resulted in a seizure in violation of the Fourth Amendment.

We hold that the trial court erred in denying appellant's motion to suppress evidence. Accordingly, appellant's conviction must be reversed.

*So ordered.*

FARRELL, Associate Judge, concurring in the result:

The trial judge made what amounts to a finding that before Officer Barnes saw the butt of the handgun in appellant's pocket, Officer Reynolds had asked appellant three times whether he was carrying ("packing") a gun. In denying appellant's motion to suppress, the judge "reject[ed] the proposition that [the officer's conduct in] having asked Mr. Hawkins *three times* under the circumstances whether he was packing a gun was anything other than reasonable under the circumstances and [the judge concluded] certainly did not constitute any type of stop" (emphasis added). The government's recitation of the facts in its brief likewise accepts the evidence as showing that before Officer Barnes saw the gun, she "heard Reynolds ask appellant at least three times if he was armed."[1] On this factual basis, therefore, we must decide the legal issue of whether appellant was "seized" within the Fourth Amendment before Barnes saw the gun, in circumstances where the officers concededly had no articulable suspicion justifying a seizure before that sighting.

In my judgment, once Reynolds had asked appellant a third time whether he was packing a gun, a reasonable person in appellant's

1. In her testimony, Barnes answered affirmatively both to whether Reynolds had asked the question "at least three times" and to whether he had asked it "approximately three times" before Barnes began watching appellant's movements and saw the gun. A moment earlier she had said Reynolds asked it "twice or three times."

shoes [2] no longer would have believed himself free to ignore the question and end the encounter with the officer. I need not decide whether the question, if asked once or even twice, would have induced the same reasonable belief. I also do not share the view of our colleague Judge Mack that appellant was seized before Reynolds even broached the question of whether appellant was carrying a gun. Before that event, the evidence showed only that the officers had approached appellant's stationary vehicle with guns undrawn, asked to talk to him about his role as victim in a recent serious assault (eliciting his ready consent), asked him also to move his car from the middle of the street to the curb and to turn off the engine while they talked,[3] and positioned themselves each on one side of the car.[4] Reynolds displayed his badge for the unexceptionable purpose of identification, since the officers were in civilian dress and their vehicle unmarked. As the trial judge found, the manner by which Reynolds initially asked respondent if he could question him about the identity of his assailants was not threatening or intimidating. In short, Judge King and I are in agreement that these facts alone do not add up to a seizure.

Nor, I will assume, did the calculus change when Reynolds first asked appellant whether he was "packing anything." Asked why he had put that question, Reynolds testified that he had done so "basically instinctive[ly] from the past ... [j]ust from past dealings with the situation with Mr. Hawkins." These "past dealings" were not explained, and the government does not argue that in themselves, or together with anything else that transpired before the gun was sighted, they furnished articulable suspicion to justify a seizure. But, given Reynolds' knowledge that appellant had been the victim of a previous shooting and, indeed, that someone had reportedly visited him at the hospital "to try to finish the job with [an] ice pick of some sort," I think the officer reasonably could have sought assurances that appellant had not armed himself with retaliation in mind, and that appellant reasonably would have discerned this (or a similar) non-accusatory purpose for the question, *i.e.*, one consistent with his freedom to terminate the encounter.

Appellant denied he was packing a gun, whereupon Reynolds asked him the question a second time in evident mistrust of his answer.[5] On the facts presented, I also need not decide whether this repetition of the question by an officer who so far apparently had not gotten the cooperation he desired (appellant had told him he didn't know "the guys who came in there to try and finish the job"), and was skeptical of appellant's first denial that he was "packing," would have induced appellant reasonably to believe his interaction with the police was no longer voluntary. For Reynolds pressed appellant

**2.** That reasonable person, of course, postulates a reasonable *innocent* person. *Florida v. Bostick*, 501 U.S. 429, 438, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991).

**3.** Although not decisive to my analysis in any event, I note that the police did not "direct" appellant to park his car and turn off the car's engine, as Judge Mack states, *ante* at 1226. Reynolds testified that he "asked" appellant to pull over, or "asked could he [appellant] please" pull over and park. Barnes stated that she did not recall Reynolds ordering or directing appellant to move the car. The judge credited the officers' testimony.

**4.** That this was the manner of approaching a car the team was trained to use in the normal "traffic stop" situation may well bear on whether a reasonable person approached would regard it as a show of force indicating he was not free to go about his business. That factor alone, however, cannot decide this case, given the Supreme

Court's treatment of police positioning in *Bostick*. *See* 501 U.S. at 435, 437, 111 S.Ct. at 2386, 2387 (fact that encounter takes place in bus, with "police tower[ing] over a seated passenger ... [who has] little room to move around" is "one factor" in whether there has been a seizure, "but it is not the only one").

**5.** In contrast to Barnes' testimony, Reynolds testified that he "believed" Barnes had signalled to him her sighting of the gun in appellant's pocket after Reynolds had asked appellant the *first* time whether he was carrying a gun. But the trial judge apparently rejected this version of the events, and the government does not rely on it, perhaps because of Reynolds' further testimony about the events. That is, he explained that appellant reached into his pocket and pulled out money, explaining to Barnes that that was all he was carrying. But Barnes testified that appellant had made these movements, in the process exposing the gun, only after Reynolds had asked appellant "at least" or "approximately" three times if he was carrying a gun.

about his possession of a gun a third time. At this point, I cannot conceive that a reasonable person would not have understood the question as accusatory and that his freedom to "'go about his business,'" *Bostick, supra* note 2, 501 U.S. at 437, 111 S.Ct. at 2387 (quoting *Michigan v. Chesternut,* 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565 (1988)), depended on giving satisfactory assurance to the officers that he was not carrying a gun. I attach no importance to the fact that appellant immediately simulated such assurance by displaying his money as "all he had" on his person; the point, rather, is that a reasonable (innocent) person in the circumstances would have felt constrained to offer similar proof as the price of being allowed to go his way. In short, he would have been seized for the time necessary to give that assurance. *See Oliver v. United States,* 618 A.2d 705 (D.C.1993).

Because the government's sole tendered (and sole legitimate) theory for recovery of the gun is its plain view discovery during a consensual encounter, I agree that the gun must be suppressed: the circumstances crossed the critical line between consent and coercion when Reynolds pressed appellant a third time about his possession of a gun. The drugs must also be suppressed as a fruit of the ensuing search incident to arrest.

KING, Associate Judge, dissenting:

This case arose as the result of a lengthy encounter between two plain-clothed police officers and appellant Hawkins which culminated in Hawkins sitting in his vehicle, Officer Reynolds standing by the driver-side window conversing with him, and Officer Barnes standing by the passenger-side door. At some point during the course of this conversation, Officer Barnes observed a gun butt protruding from Hawkins's pocket, and, after Hawkins was removed from the car, a gun and contraband were recovered from his person. It is not disputed that Barnes's observation of the gun butt provided a legitimate basis for seizing Hawkins. At issue is whether Hawkins had been seized, in a constitutional sense, before Barnes observed the gun butt. If the answer to that question is "yes," then the weapon and contraband re-

covered from Hawkins must be suppressed. If, however, there had been no seizure of Hawkins's person before Barnes observed the gun butt, then the gun and contraband are admissible against him.

I agree with Judge Farrell, contrary to Judge Mack, that the seizure of Hawkins's person did not occur until very late in the encounter, during the course of the conversation between Hawkins and Reynolds, after Hawkins had been asked one or more times whether he was armed: *i.e.,* "Are you packing?" Judge Farrell concludes that the seizure preceded the observation of the gun butt. In my view, however, we should sustain the trial court because the evidence supports the trial court's ruling that the seizure occurred after the gun butt was seen by Officer Barnes.

I begin my analysis by noting that neither the parties nor the trial judge closely focused on the precise sequence of events that immediately preceded Barnes's observation of the gun butt protruding from Hawkins's pocket. The real focus during the suppression hearing was on the differing versions of the unfolding series of events, as recited in the opinion of Judge Mack, that eventually led to the conversation between Officer Reynolds and Hawkins, while the latter sat in his car. The trial court unequivocally credited the officers' testimony on every important disputed point, and specifically found Hawkins not to be credible. In my view, those findings, under our standard of review on this record, are unassailable.

The governing statute requires that we accept facts as found by the trial court unless a finding of fact is "without evidence to support it." D.C.Code § 17–305(a) (1989 Repl.). In interpreting that statute, we have said, on countless occasions, that we will not reject a trial court's factual finding unless it is clearly erroneous. *In re J.M.,* 619 A.2d 497, 500 (D.C.1992) (en banc). Finally, when it comes to assessing the credibility of witnesses, we are particularly deferential to trial courts. *Johnson v. United States,* 616 A.2d 1216, 1234 (D.C.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1611, 123 L.Ed.2d 172 (1993) ("this court must defer to the trial court's credibility determinations respecting witnesses who

testify"). In this case there is no basis for this court substituting its interpretation of the evidence for that made by the trial judge, as Judge Mack has done. Judge Farrell and I agree that this case turns on a careful examination of the events occurring immediately before Hawkins was removed from the car. Our principal disagreement is on the degree of deference owed to the trial judge's interpretation of those events.

Judge Farrell's analysis is based on his conclusion that Officer Reynolds asked Hawkins three separate times whether he was "packing" before Officer Barnes observed the gun butt. Under that interpretation of the facts, Judge Farrell would apply a bright-line rule: when a police officer asks a suspect, for the third time, whether he is armed, a seizure occurs. As Judge Farrell observes in his separate opinion: "I cannot conceive that a reasonable person would not have understood the question as accusatory and that his freedom to 'go about his business' ... depended on giving a satisfactory assurance to the officers that he was not carrying a gun." (citations omitted). *Ante* at 1229–30. It may be that such a conclusion would be sustainable under some circumstances; the question, however, should be whether, under the facts presented here, a reasonable person would have believed he was not free to go.

Judge Farrell's and my analysis both begin with a statement of the governing principle:
> The "crucial test" for determining whether a person has been seized 'is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a *reasonable person* that he was not at liberty to ignore the police presence and go about his business.'

*See In re J.M., supra,* 619 A.2d at 499–500, citing *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (emphasis added), quoting *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). We review the determination of seizure as a question of law *de novo,* although deferring to the trial court's finding of facts unless clearly erroneous. *In re J.M.,* 619 A.2d at 500 (citations omitted). *See also United States v. Maragh,* 282 U.S.App.D.C.

256, 258, 894 F.2d 415, 417, *cert. denied,* 498 U.S. 880, 111 S.Ct. 214, 112 L.Ed.2d 174 (1990). As is often the case, the line between fact-finding and determinations of the law can be blurred so that the ultimate conclusion is one based upon a mixture of fact and law. In determining the deference, if any, to be given a trial court's resolution of such mixed questions—
> we consider, among other things, whether the issue to be decided more closely resembles one of fact or of law, and whether the trial court or the appellate court is in a position to render the decision with the higher degree of accuracy.

*Griffin v. United States,* 618 A.2d 114, 117–18 (D.C.1992).

We could resolve this difficult mixed fact/law question by imposing a bright-line rule, *e.g.,* three "Are you packing's?" constitute a seizure. That approach, however, devalues the role of the trial judge, because the trial judge must rely on an assessment of the testimony of the witnesses who have appeared, and base his or her decision on that assessment. In carrying out that responsibility, we have instructed trial judges that:
> [f]actors which might indicate a seizure would include, for example, the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the *use of language* or *tone indicating that compliance* with the officer's request must be compelled.

*In re J.M.,* 619 A.2d at 502, citing *Kelly v. United States,* 580 A.2d 1282, 1286 (D.C. 1990) (emphasis added). Applying the *Kelly* factors to the circumstances of a given case to determine whether there has been a seizure is a fact-finding process which is peculiarly within the competence of the trial court, not of an appellate court.

For example, in assessing the circumstances of the encounter between Hawkins and Officers Reynolds and Barnes, the trial court found that the officers were not particularly threatening, that they did not display weapons, and there was no evidence that they ever touched Hawkins. Although there was no specific finding regarding the nature of the language used by the officers or the

tone of their voices, the trial court rejected the assertion that the questioning by the officers "was anything other than reasonable under the circumstances and certainly did not constitute any type of stop [seizure]." That finding is not, in my view, clearly erroneous, and when we review a trial court's ruling on a motion to suppress, "the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling." *Peay v. United States,* 597 A.2d 1318, 1320 (D.C.1991) (en banc); *Brooks v. United States,* 367 A.2d 1297, 1304 (D.C. 1976) (where there have been no express findings by the trial court, this court determines whether "the denial of the motion to suppress is supportable under any reasonable view of the evidence"). Here the trial court heard from the two officers, found their testimony to be credible, and ruled, with full awareness of the applicable case law, that the actions of the officers did not constitute a seizure. That factual finding is more than supported by the record and I would affirm it.

There is another basis for disagreement with Judge Farrell's analysis. He concludes that the trial court found that Officer Reynolds asked, "Are you packing?" three times before Officer Barnes saw the butt of the gun. I do not agree that the trial court so found, or that the record supports such a finding. The trial court did find that the question "Are you packing?" was asked three times, and there is no real dispute that was the case. However, the trial court did not specifically find that the question had been asked three times before Barnes observed the gun butt. As noted above, the trial court was not called upon to make precise findings concerning the exact sequence of events, and the officers were not closely questioned on the point. Officer Barnes did testify, however: "I got my partner's attention that I thought he might have a weapon, and then my partner *asked him again* and he said no." (Emphasis added.) This testimony was preceded by testimony concerning the first "Are you packing?" and there is no evidence that the question was asked more than three times. Thus, according to Officer Barnes's

testimony, the "Are you packing?" question was asked for the third time *after* she saw the butt of the weapon. Officer Reynolds's testimony was not to the contrary, and although the trial judge did not focus on that sequence of events, the record does not support the view that the question was asked three times before the gun butt was observed.[1] Inasmuch as Judge Farrell's analysis relies on the three-question theory, his conclusion should either be re-examined, or the record should be remanded to the trial court for specific findings on that point.

For the reasons stated, I would affirm on this record. Because my colleagues do not agree with that resolution, I would, at least, remand the record to the trial court for further findings on the sequence of events with respect to what questions had been asked by Officer Reynolds when Officer Barnes observed the weapon. During the remand, the trial court would also make findings concerning the language and tone of Officer Reynolds's questions, and how those factors would impact upon a reasonable person's assessment of what he or she would, or would not, be permitted to do under these circumstances.

---

1. Under the interpretation of the evidence by Judge Mack in the lead opinion, the "Are you packing?" question was asked for the *second* time after the gun butt was seen by Officer Barnes. *Ante* at 1223.