*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-110

MARK FUNDERBURK, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-21521-17)

(Hon. Todd E. Edelman, Trial Judge)

(Argued April 21, 2021                    Decided October 7, 2021)

*Stefanie Schneider*, Public Defender Service, with whom *Samia Fam*, Public Defender Service, was on the brief, for appellant.

*Daniel Honold*, Assistant United States Attorney, with whom *Michael R. Sherwin*, Acting United States Attorney, and *Elizabeth Trosman*, *John P. Mannarino*, and *Felice Roggen*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and THOMPSON,* *Associate Judges*, and RUIZ, *Senior Judge*.

---

* Judge Thompson was an Associate Judge of the court at the time of argument. Although Judge Thompson's term ended on September 4, 2021, she continues to serve as an Associate Judge until her successor is confirmed. See D.C. Code § 11-1502 (2012 Repl.) ("Subject to mandatory retirement at age 74 and to the provisions of subchapters II and III of this chapter, a judge of a District of Columbia

GLICKMAN, *Associate Judge*: Around 2:20 a.m. on December 20, 2017, two police officers heard gunshots and commotion coming from a nearby alley in a residential neighborhood. They encountered appellant in that same alley thirty seconds later. He was alone, but the officers were aware of a few other people not far behind him. The streets were otherwise deserted at this late hour. The officers stopped and frisked appellant. The central question before us is whether the officers had reasonable suspicion to do so. We hold that they did, and therefore affirm the trial court's denial of appellant's motion to suppress.

**I.**

In the early morning hours of December 20, 2017, Metropolitan Police Department (MPD) Officers Andrew Rose and Corey Bonds were on patrol in a residential neighborhood of northeast D.C. At 2:20 a.m., the trial court found, they heard "several gunshots and what they described as a commotion, including the sound of people yelling." Officer Rose said it sounded like an "argument," although neither he nor Officer Bonds could hear what the argument was about. They thought

court appointed on or after the date of enactment of the District of Columbia Court Reorganization Act of 1970 shall serve for a term of fifteen years, and upon completion of such term, such judge shall continue to serve until the judge's successor is appointed and qualifies.").

the shots and commotion came from a nearby alley, which the trial court found was "within about a block of their location at that time."

The officers immediately drove towards the alley. They arrived at the mouth of the alley twenty seconds later. At this point, a ShotSpotter report came over the radio.[1] ShotSpotter had detected four gunshots fired near 312 Division Avenue.[2] The alley ran between Division Avenue and 51st Street; its mouth was directly behind the 300 block of Division Avenue. The officers drove into the alley. Ten seconds later — and thirty seconds after hearing the gunshots — the officers saw appellant. He was walking towards the officers, who had pulled up next to a parking lot in the alley. The trial court found that the parking lot was "almost directly across from the rear of 312 Division Avenue," the address provided by ShotSpotter.

Appellant was the first and only person the officers saw in the twenty seconds it took them to drive to the alley and the ten seconds it took them to drive down the alley. However, as the officers exited their vehicle to apprehend appellant, they

---

[1] ShotSpotter is a "surveillance network of GPS-enabled acoustic sensors" that "identify gunfire, quickly triangulate its location, and then direct officers to it." *United States v. Rickmon*, 952 F.3d 876, 878 (7th Cir. 2020).

[2] According to Officer Rose, the address given by ShotSpotter is an estimate. The shots could have come from anywhere within twenty-five meters of the address it provides.

could still "hear loud and erratic screaming." It was, the trial court found, the "same type of commotion that [they] had heard just a few moments earlier accompanying the sound of gunshots." The commotion was coming from a walkway to a house just behind appellant. Appellant was walking away from the commotion.

When the officers ordered appellant to get on the ground, he fully complied. As Officer Bonds began to handcuff him, two women approached, and a third appeared in the doorway of the house behind appellant. One of the approaching women was upset with appellant. She was repeatedly yelling at him, "Why would you do that to me?" and, "Why would you take it this far?" The second woman was restraining her. The trial court found that the first woman was behaving "as though something had been done to her," although it noted that neither of the two women "said at any point that [appellant] had actually done anything to harm them or that he had done anything illegal." The officers did not stop any of the three women.

Around the same time, a second ShotSpotter report informed the officers that the gunshots had been moving eastward at 8.7 miles per hour.[3] Officer Rose agreed

---

[3] It is unclear when exactly the second ShotSpotter report was broadcast. The trial court did not mention it in its factual findings. However, appellant concedes that it occurred after the stop but before the bullet was recovered from appellant's pocket.

that the report meant the locus of the shots had been moving, but he did not understand what it meant "technically."

While Officer Rose kept the two women away from appellant, Officer Bonds patted down appellant's waist area. He discovered a .380 caliber bullet in appellant's back pocket.[4] The officers then searched the area for a firearm and found a .380 caliber handgun lying in the grass near the parking lot. Officer Rose estimated that the gun was twenty-five feet from where he first saw appellant walking in the alley. The officers placed appellant under arrest. While processing appellant at the station, Officer Kevin Raynor discovered a .380 caliber magazine in his jacket. Officers also took a buccal swab from appellant.

Appellant was charged with one count of Carrying a Pistol Without a License,[5] one count of Possessing an Unregistered Firearm,[6] and two counts of

---

[4] At the motions hearing, the parties disputed whether Officer Bonds recovered the bullet by patting down appellant's outer clothing or by reaching directly into appellant's pocket. The trial court found it was the former, based on the body-worn camera footage and Officer Bonds's testimony. Appellant does not dispute this finding on appeal.

[5] D.C. Code § 22-4504(a) (2021 Supp.).

[6] D.C. Code § 7-2502.01(a) (2018 Repl.).

Unlawful Possession of Ammunition.[7]  He later filed a motion to suppress tangible evidence and statements made to the police at the scene.  He argued, *inter alia*, that the officers lacked reasonable articulable suspicion to stop or frisk him, and that the evidentiary fruits (i.e., the bullet, gun, and magazine, among other things) should be suppressed as products of the unlawful stop and frisk.

After a suppression hearing, the trial court denied appellant's motion.  It acknowledged that the officers "had no physical description of the shooter." However, it found that "the geographic proximity, temporal proximity, lateness of the hour, and the suspect's lone presence at the scene" "created a reasonable suspicion that [appellant] was the person who had discharged the firearm and thus justified the stop."[8]  Appellant was found guilty on all counts after a stipulated trial. He timely appealed the denial of his motion to suppress.

---

[7]  D.C. Code § 7-2506.01(a)(3) (2018 Repl.).

[8]  The trial court also found that when the bullet was recovered, appellant was subjected to an investigative stop, rather than an arrest.

## II.

Appellant argues that his mere presence near the location where officers heard gunshots thirty seconds earlier did not justify a *Terry* stop.[9] We review that question de novo.[10] In doing so, we must "defer to the [trial] court's findings of evidentiary fact and view those facts and the reasonable inferences therefrom in the light most favorable to sustaining the ruling below."[11]

## A.

An officer may conduct a brief stop "for investigatory purposes" when he has "reasonable suspicion supported by specific and articulable facts that the individual is involved in criminal activity."[12] During the stop, the officer may also conduct a "protective frisk for weapons" if he has a "reasonable, articulable suspicion that the

---

[9] *Terry v. Ohio*, 392 U.S. 1, 30 (1968).

[10] *Posey v. United States*, 201 A.3d 1198, 1201 (D.C. 2019).

[11] *Id.* (quoting *Jackson v. United States*, 157 A.3d 1259, 1264 (D.C. 2017)).

[12] *Pridgen v. United States*, 134 A.3d 297, 301 (D.C. 2016) (quoting *Robinson v. United States*, 76 A.3d 329, 335–36 (D.C. 2013)).

person detained is armed and dangerous."[13] The burden of demonstrating this suspicion is "not an onerous one."[14] It requires more than an "inchoate and unparticularized suspicion or hunch," but "substantially less than probable cause."[15]

To determine whether reasonable suspicion existed, we look to all "the facts available to the officer at the moment of the seizure or search."[16] Appellant was seized when he complied with Officer Bonds's order to get on the ground.[17] At that time, we conclude, the available information established a reasonable suspicion that appellant had fired the shots (at least some, if not necessarily all, of them). Although the officers did not have a description of the shooter, we have recognized that "sometimes the universe" of potential suspects "will be small enough that no

---

[13] *Id.* (quoting *Robinson*, 76 A.3d at 336).

[14] *In re T.L.L.*, 729 A.2d 334, 339 (D.C. 1999).

[15] *Id.* (quoting *United States v. Turner*, 699 A.2d 1125, 1128 (D.C. 1997)).

[16] *Pridgen*, 134 A.3d at 301 (quoting *Robinson*, 76 A.3d at 336).

[17] *See id.* at 302.

description at all will be required to justify a stopping for investigation."[18]  For the following reasons, we are satisfied the universe was small enough here.

To start, the officers were not relying on a tip of doubtful veracity.  Nor were they depending "on the character of the streets" and the recent crime rate in the vicinity.[19]  Rather, they responded to a potentially violent crime that undoubtedly had just occurred.[20]  The officers heard "several gunshots" and "a commotion," which Officer Rose testified sounded like an "argument."  They knew someone — possibly multiple people — fired a weapon or weapons.  The only question was who.

The officers were not directionless in seeking to answer this question.  They had a good idea of where the shots originated.  Both officers thought the shots came from an alley within a block of their location.  Officer Bonds was even more specific, testifying that he heard "a lot of screaming and yelling and loud commotion coming

---

[18]  *In re T.L.L.*, 729 A.2d at 341 (quoting 4 Wayne R. LaFave, Search and Seizure § 9.4(g) at 198 n.298 (3d ed. 1996)); *see also Armstrong v. United States*, 164 A.3d 102, 110 (D.C. 2017).

[19]  *United States v. Bellamy*, 619 A.2d 515, 522 (D.C. 1993); *see also Robinson*, 76 A.3d at 340 (responding to an area just because it was one of the Gun Recovery Unit's "top-yielding gun areas" undercut reasonable suspicion).

[20]  *See Umanzor v. United States*, 803 A.2d 983, 994 (D.C. 2002) (responding to "a report of criminal activity or gunshots" supports reasonable suspicion (quoting *Anderson v. United States*, 658 A.2d 1036, 1038 (D.C. 1995))).

from my left side between two houses . . . like it was coming from an alley." A ShotSpotter report then confirmed the gunshots came from a twenty-five-meter area that included the alley. The officers thus limited the universe of potential suspects to those at a particular location.

The officers responded to that location immediately. It took them twenty seconds to arrive at the mouth of the alley, and then another ten seconds to drive down it. Their stop of appellant occurred a mere thirty seconds after the shots rang out. "When the passage of time between the occurrence of a crime and a subsequent stop is" this short, i.e., where the stop is either "immediate or within only a few minutes," we have said that "particularized reasonable suspicion is usually found."[21] The officers also found appellant *at the crime scene*. He was exactly where they thought the shots originated. This means he was apprehended both immediately after the crime, and at the location of the crime. Such a "showing of immediacy" supports a reasonable suspicion that appellant was involved in the crime.[22]

---

[21] *Armstrong*, 164 A.3d at 110.

[22] *In re T.L.L.*, 729 A.2d at 340–41; *cf. Bennett v. United States*, 26 A.3d 745, 753–54 (D.C. 2011) (finding that a five to seven minute "lapse in time between when the robbery occurred and when the stop occurred was long enough that it did not reasonably support an inference that appellant was involved in the robbery because of . . . his proximity to the crime scene").

This immediacy also limits the possibility that the culprit (or culprits) could have fled before the officers arrived. In *United States v. Jones*, the D.C. Circuit held that officers arriving "within a minute and a half of MPD's call reporting the ShotSpotter alert" sufficiently limited the possibility that the suspect fled.[23] Here, the officers arrived even sooner — not a minute and a half after a crime was *reported*, but thirty seconds after the crime *actually occurred*.[24] Of course, it was possible that the shooter(s) had fled in those thirty seconds. But *Jones* recognized that officers need not eliminate that possibility to justify a stop of the person(s) still on the scene.[25] That is because reasonable suspicion requires "far less than certainty."[26] It demands only reasonableness,[27] and it was not unreasonable to think the shooter(s) had yet to leave, given how rapidly the officers arrived.[28] Also pertinent is that the

---

[23] *United States v. Jones*, 1 F.4th 50, 54 (D.C. Cir. 2021).

[24] *See Posey*, 201 A.3d at 1203 (distinguishing responding to a crime after it was reported from responding to a crime after it occurred).

[25] *Jones*, 1 F.4th at 54 ("But officers need not rule out all innocent possibilities before making a stop." (citing *United States v. Arvizu*, 534 U.S. 266, 277 (2002))).

[26] *Turner*, 699 A.2d at 1129.

[27] *Jackson v. United States*, 157 A.3d 1259, 1264 (D.C. 2017) ("The touchstone of the Fourth Amendment is reasonableness." (quoting *Goines v. United States*, 964 A.2d 141, 144 (D.C. 2009))).

[28] *See Turner*, 699 A.2d at 1129 (encountering appellant "within a minute" after crime occurred supported reasonable suspicion).

"commotion" the officers heard when they arrived was the same "commotion" they heard when the shots rang out, which suggests that the source of the clamor had yet to leave the scene. Thus, the officers had reasons to think people involved in the shooting remained there, and they had no indication anyone had left.[29]

We also cannot chalk up appellant's presence at the crime scene to coincidence. He was not stopped at a time and place when one would expect to find people going about their normal business. It was 2:20 a.m. on a December weeknight. When officers stopped a suspect at a similar time in *Umanzor v. United States* — there, it was 2:45 a.m. — we found the lateness supported reasonable suspicion for that same reason.[30] That appellant was in a residential neighborhood did not mean his presence in that particular location at that particular time was unsuspicious. The appellant in *Wilkerson v. United States* was stopped in a residential area, but his presence was still atypical because "it was the middle of a bitter cold night," when one would not expect residents to be outside.[31] Expectations aside, the officers reported that the surrounding streets and alley were deserted. The

---

[29] *Cf. In re A.S.*, 614 A.2d 534, 538–39 (D.C. 1992) (reasonable suspicion undercut by fact that officers knew people had left the scene of the crime).

[30] 803 A.2d at 994.

[31] *Wilkerson v. United States*, 427 A.2d 923, 926 (D.C. 1981).

officers drove through several streets and down the alley, and yet they observed no one prior to seeing appellant. Accordingly, we cannot say appellant's presence at the scene of a shooting, a mere thirty seconds after the shooting, was unremarkable and not cause for reasonable suspicion.

It is instructive to compare the facts here with those in *United States v. Delaney*.[32] In that case, police officers heard several gunshots shortly after midnight while patrolling a residential neighborhood.[33] However, unlike in this case, the officers could not identify even "the approximate location from which some of the shots originated."[34] The officers canvassed the streets and, one minute later, encountered Delaney in a parking lot a block away.[35] Up to that point, the officers had not seen anyone else.[36] Had the officers known the shots came from that parking lot, the court said, they could have inferred Delaney was the source.[37] However, the

---

[32] 955 F.3d 1077 (D.C. Cir. 2020).

[33] *Id.* at 1079–80.

[34] *Id.* at 1086.

[35] *Id.* at 1079–80.

[36] *Id.* at 1086.

[37] *Id.*

court held, "absent findings substantiating the officers' estimation of where the shots came from," the inference "no longer follow[ed]."[38]  The inference was further undermined by the fact that appellant was stopped "shortly after midnight on New Year's Eve, a time when one would have expected other folks to be out and about celebrating."[39]

*Delaney* was "a close call"[40] even though (1) the officers did not know where the shots came from and (2) Delaney was found in an area where, and at a time when, one would expect to see people engaged in innocent activity.  In contrast, Officers Rose and Bonds knew where the shots came from, and appellant was found within seconds at that location at an hour when one would not expect to see people there — at 2:20 a.m. on a December weeknight, not shortly after midnight on New Year's Eve.

Appellant argues the officers did not have sufficient grounds to stop him because they knew he was not alone in the alley.  "Being alone in the area of the

---

[38]  *Id.*

[39]  *Id.*

[40]  *Id.* at 1085.

reported crime limits the universe of potential [suspects] and strengthens individualized suspicion in any one person."[41] Here, however, while the officers may not have known there were exactly three women nearby at the time they stopped appellant, they at least knew there were one or more other persons in the vicinity from the yelling they heard.[42] And we think it fair to say that nothing meaningfully distinguished appellant from the yet-to-be-revealed source(s) of yelling, except for the fact that officers saw him first. We agree these circumstances reduced the particularized suspicion of appellant, but they did not destroy it.

Consider our decision in *United States v. Turner*. There, we held the officers' suspicion to be sufficiently particularized when it was narrowed down to two possible suspects.[43] The officers in *Turner* received a general description of a drug dealer at a certain location.[44] When the officers arrived at the location "within a

---

[41] *Armstrong*, 164 A.3d at 111.

[42] The government argues this conclusion is contrary to the trial court's findings, but we disagree. Although the trial court analyzed the scene as if appellant was "alone," it also made an explicit factual finding that Officer Bonds could "still hear loud and erratic screaming" nearby when he first saw appellant.

[43] 699 A.2d at 1126–27, 1130.

[44] *Id.* at 1127.

minute," they encountered two men, each of whom fit the description.[45] That the officers could not distinguish between the two men was, we said, "a countervailing consideration, but [it] did not necessarily dispel the reasonable suspicion focused on Turner."[46] Particularity was instead provided by the spatial and temporal proximity between the crime and the stop, as well as the fact that officers encountered "only two" possible suspects.[47]

*Turner* illustrates how particularized suspicion "does not deal with hard certainties, but with probabilities."[48] By definition, there may be a reasonable basis to suspect more than one individual of being the (one) person who committed the criminal offense under investigation. If reasonable suspicion centers on each of a small enough number of individuals, to the exclusion of all others, the *probability* of each individual's guilt is enough to establish the requisite degree of particularity to stop each of them.[49] That was the case here (even setting aside the possibility that

---

[45] *Id.* at 1127–28.

[46] *Id.* at 1128.

[47] *Id.* at 1129.

[48] *United States v. Cortez*, 449 U.S. 411, 418 (1981).

[49] *Cf. United States v. Ramos*, 443 F.3d 304, 309 (3d Cir. 2006) (officer driving between two vehicles with open windows and smelling marijuana could have reasonably concluded "that the odor was coming from one, the other, or both

there was more than one shooter). Given how quickly Officers Bonds and Rose arrived at the scene of the shooting, and the fact that the surrounding streets otherwise appeared deserted, the officers could have had reasonably particularized suspicion that appellant was the shooter, even though there may have been just as good reason to suspect one (or more) of the three women who appeared on the scene shortly after the officers spotted appellant. We think it unreasonable to insist on more precision before police can effect an investigative *Terry* stop.[50]

We acknowledge there were more potential suspects in this case than there were in *Turner* — four rather than two. But the officers in *Turner* were only looking for one suspect. Here, there were several gunshots, and the officers never testified they were only looking for one shooter. More importantly, the specter of a "dragnet seizure"[51] was nonexistent. The officers' suspicion could not apply to "a potentially

---

vehicles. For the purposes of reasonable suspicion, that *probability* establishes the odor as sufficiently particularized." (emphasis added)).

[50] *Cf. United States v. Roberts*, 849 F. App'x 863, 867 (11th Cir. 2021) ("[I]t strains credulity to say that the detectives, who smelled marijuana coming from a group of only four or five individuals, could not briefly detain those individuals simply because they could not point to any particular person with certainty and say the smell emanated from them.").

[51] *In re A.S.*, 614 A.2d at 540.

staggering number" of innocent people, as it did in *In re A.S.*,[52] but only to the few people who just happened to be in an alley at the unusual hour of 2:20 a.m. on a December weeknight, thirty seconds after a shooting occurred there. Everyone else was safe from the officers' scrutiny.[53]

Appellant cites cases where suspicion that applied equally to multiple persons was insufficiently particularized to support a *Terry* stop. In those cases, however, the suspicion was materially weaker than it was here: it was based on an unreliable source,[54] it extended to many more people,[55] or the officers took far longer to arrive

---

[52] *Id.* at 538, 540 (finding particularity lacking where officers stopped three people on the basis of a description that applied "not merely [to] the five individuals [initially] on the corner . . . , but a potentially much greater number of youths [present] in the area").

[53] As it happened, these officers refrained from conducting an investigative stop of any of the three women who appeared in the alley after the shooting. That does not alter the fact that there was objectively sufficient justification for them to stop and frisk appellant.

[54] *Cauthen v. United States*, 592 A.2d 1021, 1024 (D.C. 1991) (anonymous tip); *Roy v. United States*, 527 A.2d 742, 743 (D.C. 1987) (officers responded to report of assault but "found no evidence upon [arrival] to corroborate that an assault had taken place").

[55] *In re A.S.*, 614 A.2d at 540.

at the scene.[56] We are satisfied that those cases are factually distinguishable from this one, where the officers had personal knowledge that a crime occurred, they arrived at the scene within thirty seconds, and their suspicion only applied to a select few.

Appellant argues that this case is governed by *Williamson v. United States*,[57] but we do not agree. In *Williamson*, a majority of the panel concluded that an officer lacked reasonable suspicion to stop appellant and his two companions moments after the officer heard gunshots coming from their vicinity.[58] The majority emphasized that the officer himself "acknowledged that he had no basis for suspecting [appellant] of a crime."[59] Before stopping appellant, the officer had stated over his

---

[56] *Cauthen*, 592 A.2d at 1023 (officers took "at least fifteen minutes" to arrive); *Roy*, 527 A.2d at 743 ("[T]here was no evidence that the information about the assault was current.").

[57] 607 A.2d 471 (D.C. 1992) (per curiam).

[58] *Id.* at 478–79 (Schwelb, J., concurring); *Id.* at 485 (Ferren, J., concurring in part, dissenting in part, and dissenting from the judgment). The court ultimately held, however, that the officer could stop appellant as an *eyewitness* to the crime. *Id.* at 476–78 (Farrell, J. concurring); *Id.* at 479–81 (Schwelb, J., concurring).

[59] *Id.* at 478 (Schwelb, J., concurring); *accord id.* at 485 (Ferren, J., concurring in part, dissenting in part, and dissenting from the judgment).

radio that the four gunshots came from a vehicle that *had already fled the scene.*[60]

That is far from the case here, where Officers Rose and Bonds suspected appellant

— not someone else — of being the shooter.[61]

In sum, we hold that the stop was justified at its inception by reasonable

suspicion, and the suspicion was sufficiently particularized to appellant.

**B.**

We also conclude that the events occurring after the officers stopped appellant

but before an officer frisked him did not dispel reasonable suspicion.

---

[60] *Id.* at 478–79 (Schwelb, J., concurring); *Id.* at 485 (Ferren, J., concurring in part, dissenting in part, and dissenting from the judgment).

[61] *Williamson* is inapposite for other reasons, too. Although that stop occurred at 3:45 a.m., the officer saw "many" others at the scene, which is not the case here. *Id.* at 485 (Ferren, J., concurring in part, dissenting in part, and dissenting from the judgment); *id.* at 479 (Schwelb, J., concurring). And although Mr. Williamson and his two companions were trying to flee the scene, so was everyone else. In other words, nothing materially distinguished Mr. Williamson and his companions from the "*many* who were attempting to retreat from an area where four shots apparently had just been fired." *Id.* at 485 (Ferren, J., concurring in part, dissenting in part, and dissenting from the judgment) (emphasis added).

First, as Officer Bonds was restraining appellant, two women approached him and a third appeared in a nearby doorway. One of the women who approached was upset with appellant and, as the trial court found, "behaving as though something had been done to her." We do not know why she was upset, and the woman never accused appellant of doing anything illegal. But it is safe to say that her anger towards appellant did not dissipate the officers' suspicion that appellant was the shooter, and more likely even strengthened it.

Second, another ShotSpotter report was broadcast between the stop and the frisk. The report said the source (or sources) of the shots had been traveling eastward at 8.7 miles per hour. Appellant argues that this means the shooter had been "running or driving away" towards the east, whereas he had been "walking south at a much slower pace." Accordingly, appellant argues the second ShotSpotter report showed he was not the shooter.

This argument is unpersuasive. To start, appellant points to no evidence that he was walking south, and the trial court never made such a finding. If anything, the available evidence tends to suggest appellant *was* walking east, or at least southeast. When the officers saw appellant, they were in the alley, which a review of a map in evidence reveals was to appellant's east. If appellant was found walking from a

walkway leading into the alley towards the officers (a point appellant emphasizes), and the officers were to appellant's east, then appellant was walking east.

Moreover, the ShotSpotter report only stated a rate of speed at which the gun was moving when it was fired. Officer Rose testified he did not "technically" understand what the second ShotSpotter report signified. That is not clear to us, either. By itself, the rate of speed figure does not tell us much because there is no information as to how *far* (or exactly where) the gun traveled at that rate. Without this information, the rate of speed is not inconsistent with appellant having been the shooter. Since the officers did not see appellant until after the shooting had stopped, appellant could have been firing the gun as he was running (east) toward the alley where he then encountered the officers.[62] And even if we had this information, the resulting figure would not be inconsistent with two shooters. After all, there is no testimony that ShotSpotter can distinguish between one person firing two shots, one at point A and one at point B, and two people firing one shot each, one person firing at point A and the other at point B. In both scenarios, the shots could have been reported to be moving at 8.7 miles per hour (assuming the time elapsed between each

_____

[62] In addition, the government claims the ShotSpotter report is just as consistent with a person standing still and firing a gun while moving his arm at 8.7 miles per hour as it is with a person firing a gun while running or driving at 8.7 miles per hour. The record does not permit us to evaluate that claim.

shot is constant), even if the two shooters in the second scenario were not moving at all.

Nor was the 8.7 miles per hour rate of speed reported by ShotSpotter itself a precise figure. According to Officer Rose, that figure explained "how long it took to get from point A to point B" (or, to put it more accurately, the speed was calculated based on the distance between points A and B and how much time elapsed between the gunshot from point A and the gunshot from point B). The issue, however, is that points A and B are estimates, because — as far as we know from the record — ShotSpotter can only identify the location of a shot to within a 25-meter radius. Consequently, the distance between shots could have been longer or shorter, and thus the rate of speed greater or less, than the 8.7 miles per hour figure suggests.[63] All in all, we think the speed figure reported by ShotSpotter in this situation did not yield information that would have dispelled the officers' reasonable suspicion of

---

[63] In addition, a simple calculation shows that if the gunshots were fired in a short period of time, say several seconds, the distance the shooter purportedly traveled at 8.7 miles per hour would have been too small to indicate that the shooter had left the scene. For example, if the total elapsed time was five seconds, a shooter traveling at a speed of 8.7 miles per hour would have gone only about 64 feet at most (8.7 miles/hour x 5,280 feet/mile = 45,936 feet/hour ÷ 3600 seconds/hour = 12.76 feet/second x 5 seconds = 63.8 feet).

appellant.  We therefore conclude the officers' reasonable suspicion existed unabated from the stop to the frisk.

## C.

This brings us to the frisk itself.  The officers had reasonable suspicion that appellant had just repeatedly fired a gun.  So the officers reasonably could suspect that appellant was armed and dangerous when they encountered him.  We therefore conclude the officers were justified in frisking appellant for their safety.

## III.

For the foregoing reasons, we uphold the trial court's denial of appellant's motion to suppress evidence, and we affirm his convictions.